(Slip Opinion)     OCTOBER TERM, 2010                  1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TURNER *v.* ROGERS ET AL.

### CERTIORARI TO THE SUPREME COURT OF SOUTH CAROLINA

No. 10–10.   Argued March 23, 2011—Decided June 20, 2011

After a South Carolina family court ordered petitioner Turner to pay
$51.73 per week to respondent Rogers to help support their child,
Turner repeatedly failed to pay the amount due and was held in con-
tempt five times.  For the first four, he was sentenced to 90 days' im-
prisonment, but he ultimately paid what he owed (twice without be-
ing jailed, twice after spending a few days in custody).  The fifth time
he did not pay but completed a 6-month sentence.  After his release,
the family court clerk issued a new "show cause" order against
Turner because he was $5728.76 in arrears.  Both he and Rogers
were unrepresented by counsel at his brief civil contempt hearing.
The judge found Turner in willful contempt and sentenced him to 12
months in prison without making any finding as to his ability to pay
or indicating on the contempt order form whether he was able to
make support payments.  After Turner completed his sentence, the
South Carolina Supreme Court rejected his claim that the Federal
Constitution entitled him to counsel at his contempt hearing, declar-
ing that civil contempt does not require all the constitutional safe-
guards applicable in criminal contempt proceedings.

*Held*:
    1. Even though Turner has completed his 12-month sentence, and
there are not alleged to be collateral consequences of the contempt
determination that might keep the dispute alive, this case is not
moot, because it is "capable of repetition" while "evading review,"
*Southern Pac. Terminal Co.* v. *Interstate Commerce Comm'n*, 219
U. S. 498, 515.  A case remains live if "(1) the challenged action [is] in
its duration too short to be fully litigated prior to its cessation or ex-
piration, and (2) there [is] a reasonable expectation that the same
complaining party [will] be subjected to the same action again."
*Weinstein* v. *Bradford*, 423 U. S. 147, 149.  Here, the "challenged ac-

tion," Turner's imprisonment for up to 12 months, is "in its duration too short to be fully litigated" through the state courts (and arrive here) prior to its "expiration." *First Nat'l Bank of Boston* v. *Bellotti*, 435 U. S. 765, 774. And there is a more than "reasonable" likelihood that Turner will again be "subjected to the same action" because he has frequently failed to make his support payments, has been the subject of several civil contempt proceedings, has been imprisoned several times, and is, once again, the subject of civil contempt proceedings for failure to pay. *DeFunis* v. *Odegaard*, 416 U. S. 312, and *St. Pierre* v. *United States*, 319 U. S. 41, distinguished. Pp. 5–7.

2. The Fourteenth Amendment's Due Process Clause does not *automatically* require the State to provide counsel at civil contempt proceedings to an indigent noncustodial parent who is subject to a child support order, even if that individual faces incarceration. In particular, that Clause does not require that counsel be provided where the opposing parent or other custodian is not represented by counsel and the State provides alternative procedural safeguards equivalent to adequate notice of the importance of the ability to pay, a fair opportunity to present, and to dispute, relevant information, and express court findings as to the supporting parent's ability to comply with the support order. Pp. 7–16.

(a) This Court's precedents provide no definitive answer to the question whether counsel must be provided. The Sixth Amendment grants an indigent criminal defendant the right to counsel, see, *e.g., United States* v. *Dixon*, 509 U. S. 688, 696, but does not govern civil cases. Civil and criminal contempt differ. A court may not impose punishment "in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks* v. *Feiock*, 485 U. S. 624, 638, n. 9. And once a civil contemnor complies with the underlying order, he is purged of the contempt and is free. *Id.*, at 633. The Due Process Clause allows a State to provide fewer procedural protections in civil contempt proceedings than in a criminal case. *Id.*, at 637–641. Cases directly concerning a right to counsel in civil cases have found a presumption of such a right "*only*" in cases involving incarceration, but have not held that a right to counsel exists in *all* such cases. See *In re Gault*, 387 U. S. 1; *Vitek* v. *Jones,* 445 U. S. 480; and *Lassiter* v. *Department of Social Servs. of Durham Cty.*, 452 U. S. 18. Pp. 7–10.

(b) Because a contempt proceeding to compel support payments is civil, the question whether the "specific dictates of due process" require appointed counsel is determined by examining the "distinct factors" this Court has used to decide what specific safeguards are needed to make a civil proceeding fundamentally fair. *Mathews* v. *Eldridge*, 424 U. S. 319, 335. As relevant here those factors include

(1) the nature of "the private interest that will be affected," (2) the comparative "risk" of an "erroneous deprivation" of that interest with and without "additional or substitute procedural safeguards," and (3) the nature and magnitude of any countervailing interest in not providing "additional or substitute procedural requirement[s]." *Ibid.*

The "private interest that will be affected" argues strongly for the right to counsel here. That interest consists of an indigent defendant's loss of personal liberty through imprisonment. Freedom "from bodily restraint" lies "at the core of the liberty protected by the Due Process Clause." *Foucha* v. *Louisiana*, 504 U. S. 71, 80. Thus, accurate decisionmaking as to the "ability to pay"—which marks a dividing line between civil and criminal contempt, *Hicks, supra*, at 635, n. 7—must be assured because an incorrect decision can result in a wrongful incarceration. And because ability to comply divides civil and criminal contempt proceedings, an erroneous determination would also deprive a defendant of the procedural protections a criminal proceeding would demand. Questions about ability to pay are likely to arise frequently in child custody cases. On the other hand, due process does not always require the provision of counsel in civil proceedings where incarceration is threatened. See *Gagnon* v. *Scarpelli,* 411 U. S. 778. To determine whether a right to counsel is required here, opposing interests and the probable value of "additional or substitute procedural safeguards" must be taken into account. *Mathews, supra*, at 335.

Doing so reveals three related considerations that, taken together, argue strongly against requiring counsel in every proceeding of the present kind. First, the likely critical question in these cases is the defendant's ability to pay, which is often closely related to his indigence and relatively straightforward. Second, sometimes, as here, the person opposing the defendant at the hearing is not the government represented by counsel but the custodial parent *un*represented by counsel. A requirement that the State provide counsel to the noncustodial parent in these cases could create an asymmetry of representation that would "alter significantly the nature of the proceeding," *Gagnon, supra*, at 787, creating a degree of formality or delay that would unduly slow payment to those immediately in need and make the proceedings *less* fair overall. Third, as the Federal Government points out, an available set of "substitute procedural safeguards," *Mathews, supra*, at 335, if employed together, can significantly reduce the risk of an erroneous deprivation of liberty. These include (1) notice to the defendant that his "ability to pay" is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information from him; (3) an opportunity at the hearing for him to respond to statements and questions

about his financial status; and (4) an express finding by the court that the defendant has the ability to pay.

This decision does not address civil contempt proceedings where the underlying support payment is owed to the State, *e.g.,* for reimbursement of welfare funds paid to the custodial parent, or the question what due process requires in an unusually complex case where a defendant "can fairly be represented only by a trained advocate," *Gagnon, supra*, at 788. Pp. 10–16.

3. Under the circumstances, Turner's incarceration violated due process because he received neither counsel nor the benefit of alternative procedures like those the Court describes. He did not have clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding. No one provided him with a form (or the equivalent) designed to elicit information about his financial circumstances. And the trial court did not find that he was able to pay his arrearage, but nonetheless found him in civil contempt and ordered him incarcerated. P. 16.

387 S. C. 142, 691 S. E. 2d 470, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, and in which ROBERTS, C. J., and ALITO, JJ., joined as to Parts I–B and II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 10–10

## MICHAEL D. TURNER, PETITIONER *v.* REBECCA L. ROGERS ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF SOUTH CAROLINA

### [June 20, 2011]

JUSTICE BREYER delivered the opinion of the Court.

South Carolina's Family Court enforces its child support orders by threatening with incarceration for civil contempt those who are (1) subject to a child support order, (2) able to comply with that order, but (3) fail to do so. We must decide whether the Fourteenth Amendment's Due Process Clause requires the State to provide counsel (at a civil contempt hearing) to an *indigent* person potentially faced with such incarceration. We conclude that where as here the custodial parent (entitled to receive the support) is unrepresented by counsel, the State need not provide counsel to the noncustodial parent (required to provide the support). But we attach an important caveat, namely, that the State must nonetheless have in place alternative procedures that assure a fundamentally fair determination of the critical incarceration-related question, whether the supporting parent is able to comply with the support order.

## I
### A

South Carolina family courts enforce their child support

orders in part through civil contempt proceedings. Each month the family court clerk reviews outstanding child support orders, identifies those in which the supporting parent has fallen more than five days behind, and sends that parent an order to "show cause" why he should not be held in contempt. S. C. Rule Family Ct. 24 (2011). The "show cause" order and attached affidavit refer to the relevant child support order, identify the amount of the arrearage, and set a date for a court hearing. At the hearing that parent may demonstrate that he is not in contempt, say, by showing that he is not able to make the required payments. See *Moseley* v. *Mosier*, 279 S. C. 348, 351, 306 S. E. 2d 624, 626 (1983) ("When the parent is *unable* to make the required payments, he is not in contempt"). If he fails to make the required showing, the court may hold him in civil contempt. And it may require that he be imprisoned unless and until he purges himself of contempt by making the required child support payments (but not for more than one year regardless). See S. C. Code Ann. §63–3–620 (Supp. 2010) (imprisonment for up to one year of "adult who wilfully violates" a court order); *Price* v. *Turner*, 387 S. C. 142, 145, 691 S. E. 2d 470, 472 (2010) (civil contempt order must permit purging of contempt through compliance).

## B

In June 2003 a South Carolina family court entered an order, which (as amended) required petitioner, Michael Turner, to pay $51.73 per week to respondent, Rebecca Rogers, to help support their child. (Rogers' father, Larry Price, currently has custody of the child and is also a respondent before this Court.) Over the next three years, Turner repeatedly failed to pay the amount due and was held in contempt on five occasions. The first four times he was sentenced to 90 days' imprisonment, but he ultimately paid the amount due (twice without being jailed, twice

after spending two or three days in custody). The fifth time he did not pay but completed a 6-month sentence.

After his release in 2006 Turner remained in arrears. On March 27, 2006, the clerk issued a new "show cause" order. And after an initial postponement due to Turner's failure to appear, Turner's civil contempt hearing took place on January 3, 2008. Turner and Rogers were present, each without representation by counsel.

The hearing was brief. The court clerk said that Turner was $5,728.76 behind in his payments. The judge asked Turner if there was "anything you want to say." Turner replied,

> "Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me." App. to Pet. for Cert. 17a.

The judge then said, "[o]kay," and asked Rogers if she had anything to say. *Ibid.* After a brief discussion of federal benefits, the judge stated,

> "If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm [going to] sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release. I've also placed a lien on any SSI or other benefits." *Id.*, at 18a.

The judge added that Turner would not receive good-time or work credits, but "[i]f you've got a job, I'll make you eligible for work release." *Ibid.* When Turner asked why he could not receive good-time or work credits, the judge said, "[b]ecause that's my ruling." *Ibid.*

The court made no express finding concerning Turner's ability to pay his arrearage (though Turner's wife had voluntarily submitted a copy of Turner's application for disability benefits, cf. *post*, at 7, n. 3 (THOMAS, J., dissenting); App. 135a–136a). Nor did the judge ask any followup questions or otherwise address the ability-to-pay issue. After the hearing, the judge filled out a prewritten form titled "Order for Contempt of Court," which included the statement:

> "Defendant (was) (was not) gainfully employed and/or (had) (did not have) the ability to make these support payments when due." *Id.*, at 60a, 61a.

But the judge left this statement as is without indicating whether Turner was able to make support payments.

### C

While serving his 12-month sentence, Turner, with the help of *pro bono* counsel, appealed. He claimed that the Federal Constitution entitled him to counsel at his contempt hearing. The South Carolina Supreme Court decided Turner's appeal after he had completed his sentence. And it rejected his "right to counsel" claim. The court pointed out that civil contempt differs significantly from criminal contempt. The former does not require all the "constitutional safeguards" applicable in criminal proceedings. 387 S. C., at 145, 691 S. E. 2d, at 472. And the right to government-paid counsel, the Supreme Court held, was one of the "safeguards" not required. *Ibid.*

Turner sought certiorari. In light of differences among state courts (and some federal courts) on the applicability

of a "right to counsel" in civil contempt proceedings enforcing child support orders, we granted the writ. Compare, *e.g.*, *Pasqua* v. *Council*, 186 N. J. 127, 141–146, 892 A. 2d 663, 671–674 (2006); *Black* v. *Division of Child Support Enforcement*, 686 A. 2d 164, 167–168 (Del. 1996); *Mead* v. *Batchlor*, 435 Mich. 480, 488–505, 460 N. W. 2d 493, 496–504 (1990); *Ridgway* v. *Baker*, 720 F. 2d 1409, 1413–1415 (CA5 1983) (all finding a federal constitutional right to counsel for indigents facing imprisonment in a child support civil contempt proceeding), with *Rodriguez* v. *Eighth Judicial Dist. Ct.*, *County of Clark*, 120 Nev. 798, 808–813, 102 P. 3d 41, 48–51 (2004) (no right to counsel in civil contempt hearing for nonsupport, except in "rarest of cases"); *Andrews* v. *Walton*, 428 So. 2d 663, 666 (Fla. 1983) ("no circumstances in which a parent is entitled to court-appointed counsel in a civil contempt proceeding for failure to pay child support"). Compare also *In re Grand Jury Proceedings*, 468 F. 2d 1368, 1369 (CA9 1972) *(per curiam)* (general right to counsel in civil contempt proceedings), with *Duval* v. *Duval*, 114 N. H. 422, 425–427, 322 A. 2d 1, 3–4 (1974) (no general right, but counsel may be required on case-by-case basis).

II

Respondents argue that this case is moot. See *Massachusetts* v. *Mellon*, 262 U. S. 447, 480 (1923) (Article III judicial power extends only to actual "cases" and "controversies"); *Alvarez* v. *Smith*, 558 U. S. __, __ (2009) (slip op., at 4) ("An actual controversy must be extant at all stages of review" (internal quotation marks omitted)). They point out that Turner completed his 12-month prison sentence in 2009. And they add that there are no "collateral consequences" of that particular contempt determination that might keep the dispute alive. Compare *Sibron* v. *New York*, 392 U. S. 40, 55–56 (1968) (release from prison does not moot a *criminal* case because "collateral consequences"

are presumed to continue), with *Spencer* v. *Kemna*, 523
U. S. 1, 14 (1998) (declining to extend the presumption to
parole revocation).

The short, conclusive answer to respondents' mootness
claim, however, is that this case is not moot because it
falls within a special category of disputes that are "capable
of repetition" while "evading review." *Southern Pacific
Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911). A dispute
falls into that category, and a case based on that dispute
remains live, if "(1) the challenged action [is] in its dura-
tion too short to be fully litigated prior to its cessation or
expiration, and (2) there [is] a reasonable expectation that
the same complaining party [will] be subjected to the same
action again." *Weinstein* v. *Bradford*, 423 U. S. 147, 149
(1975) *(per curiam).*

Our precedent makes clear that the "challenged action,"
Turner's imprisonment for up to 12 months, is "in its
duration too short to be fully litigated" through the state
courts (and arrive here) prior to its "expiration." See, *e.g.*,
*First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765,
774 (1978) (internal quotation marks omitted) (18-month
period too short); *Southern Pacific Terminal Co.*, *supra*, at
514–516 (2-year period too short). At the same time, there
is a more than "reasonable" likelihood that Turner will
again be "subjected to the same action." As we have
pointed out, *supra*, at 2–3, Turner has frequently failed to
make his child support payments. He has been the subject
of several civil contempt proceedings. He has been im-
prisoned on several of those occasions. Within months of
his release from the imprisonment here at issue he was
again the subject of civil contempt proceedings. And he
was again imprisoned, this time for six months. As of
December 9, 2010, Turner was $13,814.72 in arrears, and
another contempt hearing was scheduled for May 4, 2011.
App. 104a; Reply Brief for Petitioner 3, n. 1. These facts
bring this case squarely within the special category of

cases that are not moot because the underlying dispute is "capable of repetition, yet evading review." See, *e.g.*, *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 546–547 (1976) (internal quotation marks omitted).

Moreover, the underlying facts make this case unlike *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974) *(per curiam)*, and *St. Pierre* v. *United States*, 319 U. S. 41 (1943) *(per curiam)*, two cases that respondents believe require us to find this case moot regardless. *DeFunis* was moot, but that is because the plaintiff himself was unlikely to again suffer the conduct of which he complained (and others likely to suffer from that conduct could bring their own lawsuits). Here petitioner himself *is* likely to suffer future imprisonment.

*St. Pierre* was moot because the petitioner (a witness held in contempt and sentenced to five months' imprisonment) had failed to "apply to this Court for a stay" of the federal-court order imposing imprisonment. 319 U. S., at 42–43. And, like the witness in *St. Pierre,* Turner did not seek a stay of the contempt order requiring his imprisonment. But this case, unlike *St. Pierre,* arises out of a state-court proceeding. And respondents give us no reason to believe that we would have (or that we could have) granted a timely request for a stay had one been made. Cf. 28 U. S. C. §1257 (granting this Court jurisdiction to review *final* state-court judgments). In *Sibron*, we rejected a similar "mootness" argument for just that reason. 392 U. S., at 53, n. 13. And we find this case similar in this respect to *Sibron,* not to *St. Pierre*.

## III

### A

We must decide whether the Due Process Clause grants an indigent defendant, such as Turner, a right to state-appointed counsel at a civil contempt proceeding, which may lead to his incarceration. This Court's precedents

provide no definitive answer to that question. This Court
has long held that the Sixth Amendment grants an indi-
gent defendant the right to state-appointed counsel in
a *criminal* case. *Gideon* v. *Wainwright*, 372 U. S. 335
(1963). And we have held that this same rule applies to
*criminal contempt* proceedings (other than summary
proceedings). *United States* v. *Dixon*, 509 U. S. 688, 696
(1993); *Cooke* v. *United States*, 267 U. S. 517, 537 (1925).

But the Sixth Amendment does not govern civil cases.
Civil contempt differs from criminal contempt in that it
seeks only to "coerc[e] the defendant to do" what a court
had previously ordered him to do. *Gompers* v. *Bucks Stove
& Range Co.*, 221 U. S. 418, 442 (1911). A court may not
impose punishment "in a civil contempt proceeding when
it is clearly established that the alleged contemnor is
unable to comply with the terms of the order." *Hicks* v.
*Feiock*, 485 U. S. 624, 638, n. 9 (1988). And once a civil
contemnor complies with the underlying order, he is
purged of the contempt and is free. *Id.*, at 633 (he
"carr[ies] the keys of [his] prison in [his] own pockets"
(internal quotation marks omitted)).

Consequently, the Court has made clear (in a case not
involving the right to counsel) that, where civil contempt
is at issue, the Fourteenth Amendment's Due Process
Clause allows a State to provide fewer procedural protec-
tions than in a criminal case. *Id.*, at 637–641 (State may
place the burden of proving inability to pay on the defen-
dant).

This Court has decided only a handful of cases that
more directly concern a right to counsel in civil matters.
And the application of those decisions to the present case
is not clear. On the one hand, the Court has held that the
Fourteenth Amendment requires the State to pay for
representation by counsel in a *civil* "juvenile delinquency"
proceeding (which could lead to incarceration). *In re
Gault*, 387 U. S. 1, 35–42 (1967). Moreover, in *Vitek* v.

*Jones,* 445 U. S. 480, 496–497 (1980), a plurality of four Members of this Court would have held that the Fourteenth Amendment requires representation by counsel in a proceeding to transfer a prison inmate to a state hospital for the mentally ill. Further, in *Lassiter* v. *Department of Social Servs. of Durham Cty.*, 452 U. S. 18 (1981), a case that focused upon civil proceedings leading to loss of parental rights, the Court wrote that the

> "pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." *Id.*, at 25.

And the Court then drew from these precedents "the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." *Id.*, at 26–27.

On the other hand, the Court has held that a criminal offender facing revocation of probation and imprisonment does *not* ordinarily have a right to counsel at a probation revocation hearing. *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973); see also *Middendorf* v. *Henry*, 425 U. S. 25 (1976) (no due process right to counsel in summary court-martial proceedings). And, at the same time, *Gault, Vitek,* and *Lassiter* are readily distinguishable. The civil juvenile delinquency proceeding at issue in *Gault* was "little different" from, and "comparable in seriousness" to, a criminal prosecution. 387 U. S., at 28, 36. In *Vitek,* the controlling opinion found *no* right to counsel. 445 U. S., at 499–500 (Powell, J., concurring in part) (assistance of mental health professionals sufficient). And the Court's statements in *Lassiter* constitute part of its rationale for *denying* a right to counsel in that case. We believe those statements are best read as pointing out that the Court previously had found a right to counsel "*only*" in cases

involving incarceration, not that a right to counsel exists in *all* such cases (a position that would have been difficult to reconcile with *Gagnon*).

## B

Civil contempt proceedings in child support cases constitute one part of a highly complex system designed to assure a noncustodial parent's regular payment of funds typically necessary for the support of his children. Often the family receives welfare support from a state-administered federal program, and the State then seeks reimbursement from the noncustodial parent. See 42 U. S. C. §§608(a)(3) (2006 ed., Supp. III), 656(a)(1) (2006 ed.); S. C. Code Ann. §§43–5–65(a)(1), (2) (2010 Cum. Supp.). Other times the custodial parent (often the mother, but sometimes the father, a grandparent, or another person with custody) does not receive government benefits and is entitled to receive the support payments herself.

The Federal Government has created an elaborate procedural mechanism designed to help both the government and custodial parents to secure the payments to which they are entitled. See generally *Blessing* v. *Freestone*, 520 U. S. 329, 333 (1997) (describing the "interlocking set of cooperative federal-state welfare programs" as they relate to child support enforcement); 45 CFR pt. 303 (2010) (prescribing standards for state child support agencies). These systems often rely upon wage withholding, expedited procedures for modifying and enforcing child support orders, and automated data processing. 42 U. S. C. §§666(a), (b), 654(24). But sometimes States will use contempt orders to ensure that the custodial parent receives support payments or the government receives reimbursement. Although some experts have criticized this last-mentioned procedure, and the Federal Government believes that "the routine use of contempt for non-

payment of child support is likely to be an ineffective strategy," the Government also tells us that "coercive enforcement remedies, such as contempt, have a role to play." Brief for United States as *Amicus Curiae* 21–22, and n. 8 (citing Dept. of Health and Human Services, National Child Support Enforcement, Strategic Plan: FY 2005–2009, pp. 2, 10). South Carolina, which relies heavily on contempt proceedings, agrees that they are an important tool.

We here consider an indigent's right to paid counsel at such a contempt proceeding. It is a civil proceeding. And we consequently determine the "specific dictates of due process" by examining the "distinct factors" that this Court has previously found useful in deciding what specific safeguards the Constitution's Due Process Clause requires in order to make a civil proceeding fundamentally fair. *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976) (considering fairness of an administrative proceeding). As relevant here those factors include (1) the nature of "the private interest that will be affected," (2) the comparative "risk" of an "erroneous deprivation" of that interest with and without "additional or substitute procedural safeguards," and (3) the nature and magnitude of any countervailing interest in not providing "additional or substitute procedural requirement[s]." *Ibid.* See also *Lassiter*, 452 U. S., at 27–31 (applying the *Mathews* framework).

The "private interest that will be affected" argues strongly for the right to counsel that Turner advocates. That interest consists of an indigent defendant's loss of personal liberty through imprisonment. The interest in securing that freedom, the freedom "from bodily restraint," lies "at the core of the liberty protected by the Due Process Clause." *Foucha* v. *Louisiana*, 504 U. S. 71, 80 (1992). And we have made clear that its threatened loss through legal proceedings demands "due process protection." *Addington* v. *Texas*, 441 U. S. 418, 425 (1979).

Given the importance of the interest at stake, it is obviously important to assure accurate decisionmaking in respect to the key "ability to pay" question. Moreover, the fact that ability to comply marks a dividing line between civil and criminal contempt, *Hicks*, 485 U. S., at 635, n. 7, reinforces the need for accuracy. That is because an incorrect decision (wrongly classifying the contempt proceeding as civil) can increase the risk of wrongful incarceration by depriving the defendant of the procedural protections (including counsel) that the Constitution would demand in a criminal proceeding. See, *e.g.*, *Dixon*, 509 U. S., at 696 (proof beyond a reasonable doubt, protection from double jeopardy); *Codispoti* v. *Pennsylvania*, 418 U. S. 506, 512–513, 517 (1974) (jury trial where the result is more than six months' imprisonment). And since 70% of child support arrears nationwide are owed by parents with either no reported income or income of $10,000 per year or less, the issue of ability to pay may arise fairly often. See E. Sorensen, L. Sousa, & S. Schaner, Assessing Child Support Arrears in Nine Large States and the Nation 22 (2007) (prepared by The Urban Institute), online at http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf (as visited June 16, 2011, and available in Clerk of Court's case file); *id.*, at 23 ("research suggests that many obligors who do not have reported quarterly wages have relatively limited resources"); Patterson, Civil Contempt and the Indigent Child Support Obligor: The Silent Return of Debtor's Prison, 18 Cornell J. L. & Pub. Pol'y 95, 117 (2008). See also, *e.g.*, *McBride* v. *McBride*, 334 N. C. 124, 131, n. 4, 431 S. E. 2d 14, 19, n. 4 (1993) (surveying North Carolina contempt orders and finding that the "failure of trial courts to make a determination of a contemnor's ability to comply is not altogether infrequent").

On the other hand, the Due Process Clause does not always require the provision of counsel in civil proceedings where incarceration is threatened. See *Gagnon*, 411 U. S.

778. And in determining whether the Clause requires a right to counsel here, we must take account of opposing interests, as well as consider the probable value of "additional or substitute procedural safeguards." *Mathews*, *supra*, at 335.

Doing so, we find three related considerations that, when taken together, argue strongly against the Due Process Clause requiring the State to provide indigents with counsel in every proceeding of the kind before us.

First, the critical question likely at issue in these cases concerns, as we have said, the defendant's ability to pay. That question is often closely related to the question of the defendant's indigence. But when the right procedures are in place, indigence can be a question that in many—but not all—cases is sufficiently straightforward to warrant determination *prior* to providing a defendant with counsel, even in a criminal case. Federal law, for example, requires a criminal defendant to provide information showing that he is indigent, and therefore entitled to state-funded counsel, *before* he can receive that assistance. See 18 U. S. C. §3006A(b).

Second, sometimes, as here, the person opposing the defendant at the hearing is not the government represented by counsel but the custodial parent *un*represented by counsel. See Dept. of Health and Human Services, Office of Child Support Enforcement, Understanding Child Support Debt: A Guide to Exploring Child Support Debt in Your State 5, 6 (2004) (51% of nationwide arrears, and 58% in South Carolina, are not owed to the government). The custodial parent, perhaps a woman with custody of one or more children, may be relatively poor, unemployed, and unable to afford counsel. Yet she may have encouraged the court to enforce its order through contempt. Cf. Tr. Contempt Proceedings (Sept. 14, 2005), App. 44a–45a (Rogers asks court, in light of pattern of nonpayment, to confine Turner). She may be able to provide the court

with significant information. Cf. *id.*, at 41a–43a (Rogers describes where Turner lived and worked). And the proceeding is ultimately for her benefit.

A requirement that the State provide counsel to the noncustodial parent in these cases could create an asymmetry of representation that would "alter significantly the nature of the proceeding." *Gagnon*, *supra*, at 787. Doing so could mean a degree of formality or delay that would unduly slow payment to those immediately in need. And, perhaps more important for present purposes, doing so could make the proceedings *less* fair overall, increasing the risk of a decision that would erroneously deprive a family of the support it is entitled to receive. The needs of such families play an important role in our analysis. Cf. *post*, at 10–12 (opinion of THOMAS, J.).

Third, as the Solicitor General points out, there is available a set of "substitute procedural safeguards," *Mathews*, 424 U. S., at 335, which, if employed together, can significantly reduce the risk of an erroneous deprivation of liberty. They can do so, moreover, without incurring some of the drawbacks inherent in recognizing an automatic right to counsel. Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (*e.g.*, those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay. See Tr. of Oral Arg. 26–27; Brief for United States as *Amicus Curiae* 23–25. In presenting these alternatives, the Government draws upon considerable experience in helping to manage statutorily mandated federal-state efforts to enforce child support orders. See *supra*, at 10. It does not claim that they are the only possible alternatives, and this Court's cases suggest, for

example, that sometimes assistance other than purely legal assistance (here, say, that of a neutral social worker) can prove constitutionally sufficient. Cf. *Vitek*, 445 U. S., at 499–500 (Powell, J., concurring in part) (provision of mental health professional). But the Government does claim that these alternatives can assure the "fundamental fairness" of the proceeding even where the State does not pay for counsel for an indigent defendant.

While recognizing the strength of Turner's arguments, we ultimately believe that the three considerations we have just discussed must carry the day. In our view, a categorical right to counsel in proceedings of the kind before us would carry with it disadvantages (in the form of unfairness and delay) that, in terms of ultimate fairness, would deprive it of significant superiority over the alternatives that we have mentioned. We consequently hold that the Due Process Clause does not *automatically* require the provision of counsel at civil contempt proceedings to an indigent individual who is subject to a child support order, even if that individual faces incarceration (for up to a year). In particular, that Clause does not require the provision of counsel where the opposing parent or other custodian (to whom support funds are owed) is not represented by counsel and the State provides alternative procedural safeguards equivalent to those we have mentioned (adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information, and court findings).

We do not address civil contempt proceedings where the underlying child support payment is owed to the State, for example, for reimbursement of welfare funds paid to the parent with custody. See *supra*, at 10. Those proceedings more closely resemble debt-collection proceedings. The government is likely to have counsel or some other competent representative. Cf. *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938) ("[T]he average defendant does not have

the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, *wherein the prosecution is presented by experienced and learned counsel*" (emphasis added)). And this kind of proceeding is not before us. Neither do we address what due process requires in an unusually complex case where a defendant "can fairly be represented only by a trained advocate." *Gagnon*, 411 U. S., at 788; see also Reply Brief for Petitioner 18–20 (not claiming that Turner's case is especially complex).

## IV

The record indicates that Turner received neither counsel nor the benefit of alternative procedures like those we have described. He did not receive clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding. No one provided him with a form (or the equivalent) designed to elicit information about his financial circumstances. The court did not find that Turner was able to pay his arrearage, but instead left the relevant "finding" section of the contempt order blank. The court nonetheless found Turner in contempt and ordered him incarcerated. Under these circumstances Turner's incarceration violated the Due Process Clause.

We vacate the judgment of the South Carolina Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 10–10

———————

## MICHAEL D. TURNER, PETITIONER *v.* REBECCA L. ROGERS ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 20, 2011]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, and
with whom THE CHIEF JUSTICE and JUSTICE ALITO join as
to Parts I–B and II, dissenting.

The Due Process Clause of the Fourteenth Amendment
does not provide a right to appointed counsel for indi-
gent defendants facing incarceration in civil contempt pro-
ceedings. Therefore, I would affirm. Although the Court
agrees that appointed counsel was not required in this
case, it nevertheless vacates the judgment of the South
Carolina Supreme Court on a different ground, which the
parties have never raised. Solely at the invitation of
the United States as *amicus curiae*, the majority decides
that Turner's contempt proceeding violated due process be-
cause it did not include "alternative procedural safe-
guards." *Ante*, at 15. Consistent with this Court's long-
standing practice, I would not reach that question.[1]

I

The only question raised in this case is whether the
Due Process Clause of the Fourteenth Amendment creates a
right to appointed counsel for all indigent defendants facing
incarceration in civil contempt proceedings. It does not.

———————

[1] I agree with the Court that this case is not moot because the chal-
lenged action is likely to recur yet is so brief that it otherwise evades
our review. *Ante*, at 5–7.

A

Under an original understanding of the Constitution, there is no basis for concluding that the guarantee of due process secures a right to appointed counsel in civil contempt proceedings. It certainly does not do so to the extent that the Due Process Clause requires "'that our Government must proceed according to the "law of the land"—that is, according to written constitutional and statutory provisions.'" *Hamdi* v. *Rumsfeld,* 542 U. S. 507, 589 (2004) (THOMAS, J., dissenting) (quoting *In re Winship,* 397 U. S. 358, 382 (1970) (Black, J., dissenting)). No one contends that South Carolina law entitles Turner to appointed counsel. Nor does any federal statute or constitutional provision so provide. Although the Sixth Amendment secures a right to "the Assistance of Counsel," it does not apply here because civil contempt proceedings are not "criminal prosecutions." U. S. Const., Amdt. 6; see *ante,* at 8. Moreover, as originally understood, the Sixth Amendment guaranteed only the "right to employ counsel, or to use volunteered services of counsel"; it did not require the court to appoint counsel in any circumstance. *Padilla* v. *Kentucky,* 559 U. S. ___, ___ (2010) (SCALIA, J., dissenting) (slip op., at 2); see also *United States* v. *Van Duzee,* 140 U. S. 169, 173 (1891); W. Beaney, The Right to Counsel in American Courts 21–22, 28–29 (1955); F. Heller, The Sixth Amendment to the Constitution of the United States 110 (1951).

Appointed counsel is also not required in civil contempt proceedings under a somewhat broader reading of the Due Process Clause, which takes it to approve "'[a] process of law, which is not otherwise forbidden, . . . [that] can show the sanction of settled usage.'" *Weiss* v. *United States,* 510 U. S. 163, 197 (1994) (SCALIA, J., concurring in part and concurring in judgment) (quoting *Hurtado* v. *California,* 110 U. S. 516, 528 (1884)). Despite a long history of courts exercising contempt authority, Turner has not identified

any evidence that courts appointed counsel in those proceedings. See *Mine Workers* v. *Bagwell*, 512 U. S. 821, 831 (1994) (describing courts' traditional assumption of "inherent contempt authority"); see also 4 W. Blackstone, Commentaries on the Laws of England 280–285 (1769) (describing the "summary proceedings" used to adjudicate contempt). Indeed, Turner concedes that contempt proceedings without appointed counsel have the blessing of history. See Tr. of Oral Arg. 15–16 (admitting that there is no historical support for Turner's rule); see also Brief for Respondents 47–48.

## B

Even under the Court's modern interpretation of the Constitution, the Due Process Clause does not provide a right to appointed counsel for all indigent defendants facing incarceration in civil contempt proceedings. Such a reading would render the Sixth Amendment right to counsel—as it is currently understood—superfluous. Moreover, it appears that even cases applying the Court's modern interpretation of due process have not understood it to categorically require appointed counsel in circumstances outside those otherwise covered by the Sixth Amendment.

### 1

Under the Court's current jurisprudence, the Sixth Amendment entitles indigent defendants to appointed counsel in felony cases and other criminal cases resulting in a sentence of imprisonment. See *Gideon* v. *Wainwright*, 372 U. S. 335, 344–345 (1963); *Argersinger* v. *Hamlin*, 407 U. S. 25, 37 (1972); *Scott* v. *Illinois*, 440 U. S. 367, 373–374 (1979); *Alabama* v. *Shelton*, 535 U. S. 654, 662 (2002). Turner concedes that, even under these cases, the Sixth Amendment does not entitle him to appointed counsel. See Reply Brief for Petitioner 12 (acknowledging that

"civil contempt is not a 'criminal prosecution' within the meaning of the Sixth Amendment"). He argues instead that "the right to the assistance of counsel for persons facing incarceration arises not only from the Sixth Amendment, but also from the requirement of fundamental fairness under the Due Process Clause of the Fourteenth Amendment." Brief for Petitioner 28. In his view, this Court has relied on due process to "rejec[t] formalistic distinctions between criminal and civil proceedings, instead concluding that incarceration or other confinement triggers the right to counsel." *Id.,* at 33.

But if the Due Process Clause created a right to appointed counsel in all proceedings with the potential for detention, then the Sixth Amendment right to appointed counsel would be unnecessary. Under Turner's theory, every instance in which the Sixth Amendment guarantees a right to appointed counsel is covered also by the Due Process Clause. The Sixth Amendment, however, is the only constitutional provision that even mentions the assistance of counsel; the Due Process Clause says nothing about counsel. Ordinarily, we do not read a general provision to render a specific one superfluous. Cf. *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general"). The fact that one constitutional provision expressly provides a right to appointed counsel in specific circumstances indicates that the Constitution does not also *sub silentio* provide that right far more broadly in another, more general, provision. Cf. *Albright* v. *Oliver*, 510 U. S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims" (internal quotation marks omitted)); *id.,* at 281 (KENNEDY,

J., concurring in judgment) ("I agree with the plurality that an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process"); *Stop the Beach Renourishment, Inc.* v. *Florida Dept. of Environmental Protection*, 560 U. S. ___, ___ (2010) (opinion of SCALIA, J.) (slip op., at 16) (applying *Albright* to the Takings Clause).

2

Moreover, contrary to Turner's assertions, the holdings in this Court's due process decisions regarding the right to counsel are actually quite narrow. The Court has never found in the Due Process Clause a categorical right to appointed counsel outside of criminal prosecutions or proceedings "functionally akin to a criminal trial." *Gagnon* v. *Scarpelli*, 411 U. S. 778, 789, n. 12 (1973) (discussing *In re Gault*, 387 U. S. 1 (1967)). This is consistent with the conclusion that the Due Process Clause does not expand the right to counsel beyond the boundaries set by the Sixth Amendment.

After countless factors weighed, mores evaluated, and practices surveyed, the Court has not determined that due process principles of fundamental fairness categorically require counsel in any context outside criminal proceedings. See, *e.g.*, *Lassiter* v. *Department of Social Servs. of Durham Cty.*, 452 U. S. 18, 31–32 (1981); *Wolff* v. *McDonnell*, 418 U. S. 539, 569–570 (1974); see also *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 307–308, 320–326 (1985); *Goss* v. *Lopez*, 419 U. S. 565, 583 (1975). Even when the defendant's liberty is at stake, the Court has not concluded that fundamental fairness requires that counsel always be appointed if the proceeding is not criminal.[2] See, *e.g.*, *Scarpelli*, *supra,* at 790 (proba-

——————

[2] "Criminal contempt is a crime in the ordinary sense"; therefore,

tion revocation); *Middendorf* v. *Henry*, 425 U. S. 25, 48 (1976) (summary court-martial); *Parham* v. *J. R.*, 442 U. S. 584, 599–600, 606–607, 610, n. 18 (1979) (commitment of minor to mental hospital); *Vitek* v. *Jones*, 445 U. S. 480, 497–500 (1980) (Powell, J., controlling opinion concurring in part) (transfer of prisoner to mental hospital). Indeed, the only circumstance in which the Court has found that due process categorically requires appointed counsel is juvenile delinquency proceedings, which the Court has described as "functionally akin to a criminal trial." *Scarpelli*, *supra*, at 789, n. 12 (discussing *In re Gault*, *supra*); see *ante*, at 9.

Despite language in its opinions that suggests it could find otherwise, the Court's consistent judgment has been that fundamental fairness does not categorically require appointed counsel in any context outside of criminal proceedings. The majority is correct, therefore, that the Court's precedent does not require appointed counsel in the absence of a deprivation of liberty. *Id.*, at 9–10. But a more complete description of this Court's cases is that even when liberty is at stake, the Court has required appointed counsel in a category of cases only where it would have found the Sixth Amendment required it—in criminal prosecutions.

## II

The majority agrees that the Constitution does not entitle Turner to appointed counsel. But at the invitation of the Federal Government as *amicus curiae*, the majority holds that his contempt hearing violated the Due Process Clause for an entirely different reason, which the parties

—————

criminal contemners are entitled to "the protections that the Constitution requires of such criminal proceedings," including the right to counsel. *Mine Workers* v. *Bagwell*, 512 U. S. 821, 826 (1994) (citing *Cooke* v. *United States*, 267 U. S. 517, 537 (1925); internal quotation marks omitted).

have never raised: The family court's procedures "were in adequate to ensure an accurate determination of [Turner's] present ability to pay." Brief for United States as *Amicus Curiae* 19 (capitalization and boldface type deleted); see *ante*, at 14–16. I would not reach this issue.

There are good reasons not to consider new issues raised for the first and only time in an *amicus* brief. As here, the new issue may be outside the question presented.[3] See Pet. for Cert. i ("Whether . . . an indigent defendant has no constitutional right to appointed counsel at a civil contempt proceeding that results in his incarceration"); see also *ante*, at 4–5 (identifying the conflict among lower courts as regarding "the right to counsel"). As here, the new issue may not have been addressed by, or even presented to, the state court. See 387 S. C. 142, 144, 691 S. E. 2d 470, 472 (2010) (describing the only question as whether "the Sixth and Fourteenth Amendments of the United States Constitution guarantee [Turner], as an indigent defendant in family court, the right to appointed counsel"). As here, the parties may not have preserved the issue, leaving the record undeveloped. See Tr. of Oral Arg. 49, 43 ("The record is insufficient" regarding alternative procedures because "[t]hey were raised for the very first time at the merits stage here; so, there's been no development"); Brief for Respondents 63. As here, the parties may not address the new issue in this Court, leaving its boundaries untested. See Brief for Petitioner 27, n. 15 (reiterating that "[t]he particular constitutional violation

---

[3] Indeed, the new question is not one that would even merit certiorari. See this Court's Rule 10. Because the family court received a form detailing Turner's finances and the judge could not hold Turner in contempt without concluding that he could pay, the due process question that the majority answers reduces to a factbound assessment of the family court's performance. See *ante*, at 14–16; Reply Brief for Petitioner 14–15 ("[I]n advance of his hearing, Turner supplied to the family court just such a form").

that Turner challenges in this case is the failure of the
family court to *appoint* counsel"); Brief for Respondents 62
(declining to address the Government's argument because
it is not "properly before this Court" (capitalization and
boldface type deleted).  Finally, as here, a party may even
oppose the position taken by its allegedly supportive
*amicus.*  See Tr. of Oral Arg. 7–12, 14–15 (Turner's coun-
sel rejecting the Government's argument that any proce-
dures short of a categorical right to appointed counsel
could satisfy due process); Reply Brief for Petitioner 14–
15.

Accordingly, it is the wise and settled general practice of
this Court not to consider an issue in the first instance,
much less one raised only by an *amicus.*  See this Court's
Rule 14.1(a) ("Only the questions set out in the petition, or
fairly included therein, will be considered by the Court");
*Adarand Constructors, Inc.* v. *Mineta,* 534 U. S. 103, 110
(2001) *(per curiam)* ("[T]his is a court of final review and
not first view" (internal quotation marks omitted)); *United
Parcel Service, Inc.* v. *Mitchell,* 451 U. S. 56, 60, n. 2 (1981)
(declining to consider an *amicus'* argument "since it was
not raised by either of the parties here or below" and was
outside the grant of certiorari).  This is doubly true when
we review the decision of a state court and triply so when
the new issue is a constitutional matter.  See *McGoldrick*
v. *Compagnie Generale Transatlantique,* 309 U. S. 430,
434 (1940) ("[I]t is only in exceptional cases, and then only
in cases coming from the federal courts, that [this Court]
considers questions urged by a petitioner or appellant not
pressed or passed upon in the courts below"); *Cardinale* v.
*Louisiana,* 394 U. S. 437, 438 (1969) ("[T]he Court will not
decide federal constitutional issues raised here for the first
time on review of state court decisions").

The majority errs in moving beyond the question that
was litigated below, decided by the state courts, petitioned
to this Court, and argued by the parties here, to resolve a

question raised exclusively in the Federal Government's *amicus* brief. In some cases, the Court properly affirms a lower court's judgment on an alternative ground or accepts the persuasive argument of an *amicus* on a question that the parties have raised. See, *e.g.*, *United States* v. *Tinklenberg*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 13). But it transforms a case entirely to vacate a state court's judgment based on an alternative constitutional ground advanced only by an *amicus* and outside the question on which the petitioner sought (and this Court granted) review.

It should come as no surprise that the majority confines its analysis of the Federal Government's new issue to acknowledging the Government's "considerable experience" in the field of child support enforcement and then adopting the Government's suggestions *in toto*. See *ante*, at 14–15. Perhaps if the issue had been preserved and briefed by the parties, the majority would have had alternative solutions or procedures to consider. See Tr. of Oral Arg. 43 ("[T]here's been no development. We don't know what other States are doing, the range of options out there"). The Federal Government's interest in States' child support enforcement efforts may give the Government a valuable perspective,[4] but it does not overcome the strong reasons behind the Court's practice of not considering new issues, raised and addressed only by an *amicus*, for the first time in this Court.

## III

For the reasons explained in the previous two sections, I would not engage in the majority's balancing analysis. But there is yet another reason not to undertake the

—————

[4] See, *e.g.*, Deadbeat Parents Punishment Act of 1998, 112 Stat. 618; Child Support Recovery Act of 1992, 106 Stat. 3403; Child Support Enforcement Amendments of 1984, 98 Stat. 1305; Social Services Amendments of 1974, 88 Stat. 2337.

*Mathews* v. *Eldridge* balancing test here. 424 U. S. 319 (1976). That test weighs an individual's interest against that of the Government. *Id.*, at 335 (identifying the opposing interest as "the Government's interest"); *Lassiter*, 452 U. S., at 27 (same). It does not account for the interests of the child and custodial parent, who is usually the child's mother. But their interests are the very reason for the child support obligation and the civil contempt proceedings that enforce it.

When fathers fail in their duty to pay child support, children suffer. See Cancian, Meyer, & Han, Child Support: Responsible Fatherhood and the Quid Pro Quo, 635 Annals Am. Acad. Pol. & Soc. Sci. 140, 153 (2011) (finding that child support plays an important role in reducing child poverty in single-parent homes); cf. Sorensen & Zibman, Getting to Know Poor Fathers Who Do Not Pay Child Support, 75 Soc. Serv. Rev. 420, 423 (2001) (finding that children whose fathers reside apart from them are 54 percent more likely to live in poverty than their fathers). Nonpayment or inadequate payment can press children and mothers into poverty. M. Garrison, The Goals and Limits of Child Support Policy, in Child Support: The Next Frontier 16 (J. Oldham & M. Melli eds. 2000); see also Dept. of Commerce, Census Bureau, T. Grall, Custodial Mothers and Fathers and Their Child Support: 2007, pp. 4–5 (2009) (hereinafter Custodial Mothers and Fathers) (reporting that 27 percent of custodial mothers lived in poverty in 2007).

The interests of children and mothers who depend on child support are notoriously difficult to protect. See, *e.g.*, *Hicks* v. *Feiock*, 485 U. S. 624, 644 (1988) (O'Connor, J., dissenting) ("The failure of enforcement efforts in this area has become a national scandal" (internal quotation marks omitted)). Less than half of all custodial parents receive the full amount of child support ordered; 24 percent of those owed support receive nothing at all. Custodial

Mothers and Fathers 7; see also Dept. of Health and Human Services, Office of Child Support Enforcement, FY 2008 Annual Report to Congress, App. III, Table 71 (showing national child support arrears of $105.5 billion in 2008). In South Carolina alone, more than 139,000 non-custodial parents defaulted on their child support obligations during 2008, and at year end parents owed $1.17 billion in total arrears. *Id.*, App. III, Tables 73 and 71.

That some fathers subject to a child support agreement report little or no income "does not mean they do not have the ability to pay any child support." Dept. of Health and Human Services, H. Sorensen, L. Sousa, & S. Schaner, Assessing Child Support Arrears in Nine Large States and the Nation 22 (2007) (prepared by The Urban Institute) (hereinafter Assessing Arrears). Rather, many "deadbeat dads"[5] "opt to work in the underground economy" to "shield their earnings from child support enforcement efforts." Mich. Sup. Ct., Task Force Report: The Underground Economy 10 (2010) (hereinafter Underground Economy). To avoid attempts to garnish their wages or otherwise enforce the support obligation, "deadbeats" quit their jobs, jump from job to job, become self-employed, work under the table, or engage in illegal activity.[6] See Waller & Plotnick, Effective Child Support Policy for Low-Income Families: Evidence from Street Level Research, 20 J. Pol'y Analysis & Mgmt. 89, 104 (2001); Assessing Arrears 22–23.

Because of the difficulties in collecting payment through

_____

[5] See Deadbeat Parents Punishment Act of 1998, 112 Stat. 618 (referring to parents who "willfully fai[l] to pay a support obligation" as "[d]eadbeat [p]arents").

[6] In this case, Turner switched between eight different jobs in three years, which made wage withholding difficult. App. 12a, 18a, 24a, 47a, 53a, 136a–139a. Most recently, Turner sold drugs in 2009 and 2010 but paid not a penny in child support during those years. *Id.*, at 105a–111a; App. to Brief for Respondents 16a, 21a–24a, 29a–32a, 37a–54a.

traditional enforcement mechanisms, many States also use civil contempt proceedings to coerce "deadbeats" into paying what they owe. The States that use civil contempt with the threat of detention find it a "highly effective" tool for collecting child support when nothing else works. Compendium of Responses Collected by the U. S. Dept. of Health and Human Services Office of Child Support Enforcement (Dec. 28, 2010), reprinted in App. to Brief for Sen. DeMint et al. as *Amici Curiae* 7a; see *id.*, at 3a, 9a. For example, Virginia, which uses civil contempt as "a last resort," reports that in 2010 "deadbeats" paid approximately $13 million "either before a court hearing to avoid a contempt finding or after a court hearing to purge the contempt finding." *Id.*, at 13a–14a. Other States confirm that the mere threat of imprisonment is often quite effective because most contemners "will pay . . . rather than go to jail." *Id.*, at 4a; see also Underground Economy C–2 ("Many judges . . . report that the prospect of [detention] often causes obligors to discover previously undisclosed resources that they can use to make child support payments").

This case illustrates the point. After the family court imposed Turner's weekly support obligation in June 2003, he made no payments until the court held him in contempt three months later, whereupon he paid over $1,000 to avoid confinement. App. 17a–18a, 131a. Three more times, Turner refused to pay until the family court held him in contempt—then paid in short order. *Id.*, at 23a–25a, 31a–34a, 125a–126a, 129a–130a.

Although I think that the majority's analytical framework does not account for the interests that children and mothers have in effective and flexible methods to secure payment, I do not pass on the wisdom of the majority's preferred procedures. Nor do I address the wisdom of the State's decision to use certain methods of enforcement. Whether "deadbeat dads" should be threatened with in-

THOMAS, J., dissenting

carceration is a policy judgment for state and federal lawmakers, as is the entire question of government involvement in the area of child support. See Elrod & Dale, Paradigm Shifts and Pendulum Swings in Child Custody, 42 Fam. L. Q. 381, 382 (2008) (observing the "federalization of many areas of family law" (internal quotation marks omitted)). This and other repercussions of the shift away from the nuclear family are ultimately the business of the policymaking branches. See, *e.g.*, D. Popenoe, Family in Decline in America, reprinted in War Over the Family 3, 4 (2005) (discussing "four major social trends" that emerged in the 1960's "to signal a widespread 'flight'" from the "nuclear family"); Krause, Child Support Reassessed, 24 Fam. L. Q. 1, 16 (1990) ("Easy-come, easy-go marriage and casual cohabitation and procreation are on a collision course with the economic and social needs of children"); M. Boumil & J. Friedman, Deadbeat Dads 23–24 (1996) ("Many [children of deadbeat dads] are born out of wedlock . . . . Others have lost a parent to divorce at such a young age that they have little conscious memory of it").

\*    \*    \*

I would affirm the judgment of the South Carolina Supreme Court because the Due Process Clause does not provide a right to appointed counsel in civil contempt hearings that may lead to incarceration. As that is the only issue properly before the Court, I respectfully dissent.