# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania,   :
Department of Environmental   :
Protection,   :
                Petitioner   :
   :
       v.   :
   :
Service Station Co. Inc. 1324 d/b/a   :
Fulton's Service Station,   :      Heard: August 19, 2025[1]
             Respondent :      No. 214 M.D. 2023

BEFORE:   HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE WALLACE           FILED: December 9, 2025

On August 19, 2025, the Court held a civil contempt purge/sanctions hearing in this matter. Petitioner Commonwealth of Pennsylvania, Department of Environmental Protection's (Department) November 15, 2024 "Certification of Noncompliance with [the Court's August 15, 2024 Contempt] Order" (Certification); January 16, 2025 "Petition for Contempt" (Purge/Sanctions Petition); and September 2, 2025 "Post-Hearing Memorandum of Law" (Post Hearing MOL"), are now before the Court. There are no filings from Service Station Co. Inc. 1324 d/b/a Fulton's Service Station (Corporate Respondent) or its principal officer, Robert J. Fulton, Jr. (Fulton), for the Court to consider.

---

[1]Per the request of Robert J. Fulton, Jr., the principal of Service Station Co. Inc. 1324 d/b/a Fulton's Service Station, the Court waited at least 30 days to issue this Opinion to allow Corporate Respondent additional time to come into compliance with the Court's Orders and controlling statutory and regulatory requirements.

## I.  INTRODUCTION

This case originated as an enforcement action at the Department level, and evolved into an enforcement, and now contempt proceeding at the judicial level. The underlying conduct concerns Corporate Respondent's failure to comply with the Storage Tank and Spill Prevention Act (Act)[2] and attendant Regulations. The Legislature delegated authority to enforce and administer the Act to the Department, which requires storage tank systems operated in the Commonwealth to be registered with the Department. In Pennsylvania, storage tank owners must also register a change of tank status— *i.e.*, placing the tank "temporarily out-of-service"—with the Department. The Regulations require that the storage tanks must be permanently closed within three years of a registration change to "temporarily out-of-service." 25 Pa. Code §245.451(h). This requirement exists for safety reasons, as the General Assembly found that storage tanks release substances that contaminate land and water, threaten public safety, and impact the health of affected residences. *See* 35 P.S. §6021.102(a)(1)-(2), (5). The Act aims to "prevent and abate pollution caused by storage tanks," by creating damages liability from storage tank releases, requiring prompt cleanup and removal of pollution and regulated substances, and imposing civil and criminal penalties for noncompliance. 35 P.S. §6021.1312.

## II.  BACKGROUND

Corporate Respondent is a Pennsylvania corporation that was formerly a retail gas station and currently operates as an "automobile service center" at 1324 Washington Lane, Philadelphia, Pennsylvania (Property), where three underground storage tank systems (Tanks) are located. In 2000, Corporate Respondent registered

---

[2]Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101–6021.2104.

2

the Tanks as "temporarily out-of-service." The Tanks were not permanently closed in 2003, as per the three-year requirement under the Act and Regulations.

## A. Administrative Enforcement

In 2016, the Department issued a notice of violation upon Corporate Respondent for its failure to permanently close the Tanks. Two years later, by 2018, when the Tanks had not been permanently closed, the Department notified Corporate Respondent the matter would be referred for internal enforcement at the administrative level. On April 25, 2019, the Department issued an administrative order (Administrative Order) against Corporate Respondent[3] for failing to permanently close the Tanks and filing proof of the same with the Department.[4] The Administrative Order required Corporate Respondent to provide written confirmation of its intention to close the Tanks and file closure reports with the Department by specific dates, which Corporate Respondent failed to do. Moreover, Corporate Respondent never appealed the Administrative Order.

In early 2020, the Department twice notified Corporate Respondent's principal officer, Fulton, who serves as President and Treasurer of Corporate Respondent, of the business's failure to comply with the Administrative Order and of the Department's intention to pursue external enforcement proceedings at the judicial level if Corporate Respondent continued to not comply with the Administrative Order. Three years later, in 2023, the Department conducted a site visit of the Property which revealed the Tanks had still not been permanently closed.

---

[3]The Administrative Order was also issued against Fulton's mother, Mary J. Fulton, since deceased, as the former landowner of the Property, 35 P.S. §§ 6021.1302 and 6021.1310, and as an "owner" as defined under the Act, pursuant to 35 PS. §6021.103, due to her previous ownership interest in the Tanks.

[4]These violations also triggered public nuisance (35 P.S. §6021.1304) and unlawful conduct (35 P.S. §6021.1310) violations under the Act.

## B. Judicial Enforcement

On May 2, 2023, the Department filed a petition to enforce its Administrative Order (Enforcement Petition) in this Court pursuant to Pennsylvania Rule of Appellate Procedure 3761. The Court granted Fulton's request to continue the enforcement hearing to allow Fulton additional time to retain counsel for Corporate Respondent.[5] *See Spirit of the Avenger Ministries v. Commonwealth*, 767 A.2d 1130, 1130 (Pa. Cmwlth. 2001) (providing that non-attorneys cannot represent parties in court). To date, Corporate Respondent has not obtained counsel.

Before an enforcement hearing could be rescheduled, the Department and Fulton entered an agreement in which Corporate Respondent committed, *inter alia*, to completing a site assessment and permanently closing the Tanks by December 2023; filing closure reports by January 2024; and, if contamination or free product was discovered upon closure of the Tanks, taking corrective action pursuant to 25 Pa. Code Chapter 245, Subchapter D, §§301-314. The Court adopted this agreement by July 14, 2023 Order (Stipulation Order).

In the months following the Stipulation Order, the Department contacted Corporate Respondent, via Fulton, numerous times to follow-up on compliance with the Stipulation Order. In December 2023, Fulton phoned the Department to share the name of the third-party tank removal company that Fulton had contacted; however, Corporate Respondent never entered into a contract for closure of the Tanks.

---

[5]In this filing, Fulton also attempted to argue the Tanks were not in violation of the law. In its answer thereto, the Department did not oppose a continuance but did contest Fulton's collateral merits attack, noting Corporate Respondent failed to appeal the Administrative Order.

## C. First Civil Contempt

On February 7, 2024, one week after the final deadline lapsed under the Stipulation Order, the Department filed a petition for civil contempt (Contempt Petition) of Corporate Respondent for its failure to comply with the Court's Stipulation Order. While the Contempt Petition requested general, unspecified *coercive* civil contempt sanctions, **the proposed order attached to the filing sought Fulton's incarceration as a civil contempt sanction**. Thereafter, the Court issued a Rule on Corporate Respondent to show cause as to why the Department should not be granted its requested relief and scheduled a civil contempt hearing for later that month. On the eve of the scheduled hearing in late April 2024, Fulton filed another continuance request to find counsel for Corporate Respondent, which this Court granted. Soon after, the Department filed a May 30, 2024 "Disclosure" with this Court, advising that during a phone call with Department personnel, Fulton shared he never intended to obtain counsel for the business and only filed the extension request to "buy time." Dep't Disclosure, 5/30/24, at 2. Accordingly, the Court issued an Order rescheduling the contempt hearing for August 6, 2024.[6] When Fulton filed a third continuance request to obtain counsel for Corporate Respondent in July 2024, the Court denied the request.

At the first civil contempt hearing, Corporate Respondent did not have counsel, and thus, did not appear. Fulton appeared and advised that he had obtained counsel for Corporate Respondent, however, represented that counsel had contracted COVID-19, and could not appear at the hearing. This statement was not corroborated by an entry of appearance or other counseled filing and Fulton could not participate on Corporate Respondent's behalf. *See Spirit of Avengers*. The

---

[6]The Court also noted a date by which Corporate Respondent could file its counseled answer, however, no answer was filed.

5

Department put forth its case-in-chief, which included presenting witness testimony from Department personnel Carly Baker and Thomas Buterbaugh, both of whom the Court found to be credible. Additionally, the Department presented two exhibits, which the Court admitted into evidence: Exhibit DEP-1 (the Department's Registration/Permitting Storage Tanks form, reflecting an owner's certification signed by Fulton) and Exhibit DEP-2 (the parties' July 11, 2023 Stipulation, which Fulton signed on behalf of Corporate Respondent as the "owner/responsible party" for the Tanks).

By August 15, 2024 Order (Contempt Order), the Court adjudicated Corporate Respondent in civil contempt; imposed purge conditions; and as a civil contempt sanction, entered a daily fine of $100, payable to the "Commonwealth of Pennsylvania Storage Tank Fund," if Corporate Respondent failed to purge itself. The Contempt Order stated that to purge itself of civil contempt, Corporate Respondent must permanently close the Tanks by October 7, 2024; register the closure with the Department by November 4, 2024; and if closure revealed contamination, take corrective action as required by controlling law. Further therein, the Court named Fulton as the owner/responsible party for the Tanks and cautioned that Corporate Respondent's failure to purge itself of civil contempt may ultimately result in Fulton's incarceration, whilst encouraging Fulton to "promptly" have the Contempt Order reviewed by counsel. Finally, the Contempt Order directed the Department to file a certification with the Court by November 18, 2024, indicating whether Corporate Respondent had purged the contempt.

### D. Second Civil Contempt

In November 2024, the Department timely filed a Certification with the Court, indicating Corporate Respondent had not purged itself of contempt. In

6

January 2025, the Department filed the Purge/Sanctions Petition, asking the Court to enter an Order directing that Corporate Respondent shall remain in civil contempt; enter judgment on the fines imposed by the Contempt Order; issue a new purge schedule; and **order Fulton's incarceration as a civil contempt sanction**. Thereafter, a hearing was scheduled for April 8, 2025. Before the hearing, the Court held an April 1, 2025 telephonic status conference with the parties and invited Fulton to participate because his personal civil liberties may now be at stake at the upcoming hearing. During the status conference, Fulton informed the Court that Corporate Respondent was unable to purge itself and that Fulton was unable to communicate this to the Court sooner, because Corporate Respondent did not have counsel. Additionally, during the status conference, Department counsel stated that Fulton had transferred the Property to his daughter for $1 and further intimated the Department's belief that the Property may also be subject to a pending sheriff's sale.

Following the status conference, the Court entered an April 4, 2025 Memorandum and Order cancelling the upcoming hearing; rescheduling the hearing to June 2025; and directing the parties to file memoranda of law regarding a handful of issues, including the burden of proof in proving and defending against purging contempt; the difference between civil and criminal contempt and when each applies; how the "ability to comply" manifests throughout the proceedings; and, how the proceeding may be impacted by a change in Property ownership, *inter alia*. Additionally, the Court ordered the parties to prepare and present evidence regarding specific topics, like Property ownership and Corporate Respondent's finances.

Thereafter, on April 29, 2025, the Department requested a hearing continuance, citing the unavailability of its staff at the new hearing date, which the Court granted by May 2, 2025 Order. This Order rescheduled the purge/sanctions

7

hearing for August 19, 2025, and advised that absent extraordinary circumstances, no further continuances would be granted. One week later, on May 6, 2025, the Department filed an application for a pre-hearing conference, stating that following last month's status conference, the Department increased its efforts to settle this matter with Corporate Respondent. Specifically, the Department claimed that on May 5, 2025, it e-mailed Fulton and called him twice. The Department alleged that when agency personnel identified themselves on the call with Fulton, Fulton hung up the phone, and when the Department called Fulton back, the call was sent to voicemail. Despite only 24 hours having subsided from the Department's unsuccessful efforts to connect with Fulton regarding settlement, the Department filed its application for pre-hearing conference the next day, and indicated there was

> some urgency to having this [settlement] discussion as soon as possible, because [the Department's] settlement proposal involves [the Department] handling the permanent closure of the [T]anks and attaching a lien to the real estate (on which the [T]anks are situated) that [] Fulton transferred to his daughter on January 13, 2025, and that real estate was recently listed on the real estate market and is the subject of a pending sheriff sale.

Dep't Appl. for Pre-Hr'g Conf., 5/6/25, ¶6 (weblinks for Property listings omitted).

Accordingly, the Court scheduled a second pre-hearing telephonic conference with the parties for May 15, 2025.[7] Both Fulton and Department counsel attended telephonically and were permitted by the Court to engage in off-the-record discussions regarding settlement during the time allotted for the conference. Following that discussion, the Department presented to the Court that it had reached a tentative settlement with Corporate Respondent's representative, Fulton, which

---

[7] In this Order, the Court intentionally referred to the hearing as the "Contempt/Sanctions Hearing." This name has evolved throughout the course of this proceeding.

Fulton similarly confirmed. Given the prolonged history of the case, the Court insisted on keeping the hearing scheduled for August 19, 2025, and advised that if the parties were able to reach a settlement, the Department could praecipe the Court to discontinue the matter.

Returning to the Court's April 4, 2025 directives, only the Department briefed the multitude of issues, by filing a responsive "Pre-Hearing Memorandum of Law" (Pre-Hearing MOL) on May 22, 2025. In its Pre-Hearing MOL, the Department represented the burden of proving the "ability to comply" rested solely with the respondent party as an affirmative defense and that it was neither the burden of the Department nor role of the Court to address the issue where not asserted by Corporate Respondent. Neither Fulton nor Corporate Respondent filed anything responsive to the Court's April 4, 2025 Memorandum and Order.

Thereafter, the Department filed an uncontested June 3, 2025 "Application for Leave of Court to Conduct Discovery" for information relating to Corporate Respondent's and Fulton's present "ability to pay/comply" with the Court's Stipulation and Contempt Orders. While it believed the "ability to comply" issue can only be raised by Corporate Respondent, and thus, discovery on the issue was neither necessary nor appropriate, the Department perceived a desire from the Court for discovery on the issue, and thus, filed the request to satisfy the Court's expectation. By July 24, 2025 Order, the Court denied the Department's discovery request without prejudice, and by August 5, 2025 Memorandum Opinion, offered its reasoning. In this Opinion, the Court, sitting as a single Judge,[8] applied the due process comports from the United States Supreme Court's ruling in *Turner v. Roger*s,

---

[8]Single-Judge opinions of this Court are not binding but may be cited for their persuasive value. *See* Section 414(b) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(b).

564 U.S. 431 (2011), to hold that because incarceration ruminates in the background of all civil contempt matters, *see Maggio v. Zeitz*, 333 U.S. 56 (1948),

> [t]he following due process protections appear to be required in every civil contempt proceeding, based on the Court's review of these cases,[9] and should take effect upon the filing of a facially lawful contempt petition in this Court, regardless of whether the sanction sought is to be against a business or a person and regardless of whether the sanction is a monetary fine, incarceration, or otherwise.
>
> 1. Clear notice to Corporate Respondent, in the hearing notice, that its present "ability to comply" is a critical issue in the contempt proceeding;
>
> 2. The use of a form to elicit relevant financial information;
>
> 3. An opportunity at the hearing for Corporate Respondent to respond to statements and questions about its financial status, by producing a corporate officer, here, Fulton, to colloquy with the Court at the hearing about Corporate Respondent's present ability to comply, and permitting the Department to cross-examine Fulton; and
>
> 4. Express findings by the Court as to Corporate Respondent's ability to comply.

Cmwlth. Ct. Mem. Op., 8/5/25, at 10.

That same day, the Court also simultaneously issued a hearing notice (Hearing Notice), which provided a framework for the upcoming August 19, 2025 hearing. Attached to the Hearing Notice were two financial affidavits (Financial Affidavit Forms or Forms), as per *Turner*, one directed to Corporate Respondent,

---

[9]*Turner,* 564 U.S. 431*; Maggio*, 333 U.S. 56, *Barrett v. Barrett*, 368 A.2d 616 (Pa. 1977), and *Commonwealth v. Diaz,* 191 A.3d 850 (Pa. Super. 2018).

the other to Fulton, as he may be sanctioned at a future date for Corporate Respondent's failure to purge itself. The Hearing Notice advised, *inter alia*, that "Corporate Respondent's present ability to comply with the Court's Orders, especially Corporate Respondent's present ability to comply with the purge conditions set by the Court's August 15, 2024 Order, is a **critical** consideration the Court will make in this proceeding." Cmwlth. Ct. Hr'g Notice, 8/5/25, ¶12 (emphases in original).

Although Corporate Respondent is a business entity that requires counsel to appear in court, the Court made a provisional allowance for Fulton, on Corporate Respondent's behalf, to colloquy with the Court exclusively about the question of Corporate Respondent's present ability/inability to comply with the Court's Orders. The Court, however, prohibited *Corporate Respondent* from taking any action throughout the proceeding that was not explicitly authorized by the Hearing Notice, such as, presenting witnesses and cross-examining Department witnesses. Cmwlth. Ct. Hr'g Notice ¶24. The Hearing Notice stated that if Corporate Respondent "wishes to present a defense of its inability to comply with the Court's Orders, in advance of the hearing, Corporate Respondent may complete the Financial Affidavit Forms and compile relevant, related documentation for the Court's consideration." *Id.* ¶17 (emphasis in original). To this end, Corporate Respondent and Fulton were invited to submit the Financial Affidavit Forms and any other relevant documents to Department Counsel by Wednesday, August 13, 2025, at 4:00 p.m. to counsel's e-mail address. *Id.* ¶¶17, 25. **Moreover, the Hearing Notice explained that the Court would not incarcerate Fulton as a civil contempt sanction from the August 19, 2025 proceeding but would entertain doing so at a future date if Corporate Respondent failed to purge itself.** Finally,

11

the Hearing Notice afforded the parties the opportunity to prepare post-hearing memoranda of law to address the imposition of the additional due process comports being applied to this proceeding. Absent a Department filing indicating that a settlement had been reached, the matter proceeded to the August 19, 2025 hearing.

### E. The August 19, 2025 Purge/Sanctions Hearing

On August 19, 2025, the Court held a civil contempt purge/sanctions hearing. The Department and Fulton appeared; Corporate Respondent did not obtain counsel and did not appear. The Department presented Baker and Buterbaugh as witnesses, and at the start of the hearing, moved for the entry of Exhibits DEP 1-14 into evidence, each of which were admitted. Exhibits DEP-1 through DEP-10 were introduced through Baker's testimony and Exhibits DEP-11 through DEP-14 were introduced through Buterbaugh's testimony. Fulton was also afforded the opportunity to colloquy with the Court about Corporate Respondent's ability to comply, which the Department was permitted to cross-examine. Furthermore, because Baker's testimony elicited information regarding Corporate Respondent's ability to comply, Fulton was also allowed to cross-examine Baker exclusively on her testimony regarding Corporate Respondent's ability to comply. The Department objected at the hearing, and the Court reserved its ruling on whether inclusion of such testimony is appropriate, and if so, how it should be weighed, for this Opinion.

1. Purge/Continuing Contempt

#### Baker's Testimony

Baker is an Environmental Protection Specialist with the Department's Storage Program. She has worked for the Department for 14 years, nine years of which she has held her current position. In this role, Baker oversees the regulation of storage tank facilities into compliance with the Act and Regulations. Baker

12

testified that to date, Corporate Respondent has not complied with the Department's Administrative Order or the Court's Contempt Order, both of which directed permanent closure of the Tanks. Specifically, Baker stated the Tanks remain in the ground at the Property and have not yet been removed. Further, Baker stated that Corporate Respondent did not comply **with paragraphs 4-6 of the Contempt Order** because the Department has never received an amended registration form nor closure report as required therein. *See* Exhibit DEP-1 (Contempt Order). This conclusion was based on the result of the Department's site visits at the Property. Baker stated that the Department visited the Property over the last year and did not observe any signs of earth disturbance which would reflect Tank closure. Most recently, on August 13, 2025, Baker visited the Property, where she again did not observe any ground disturbances or heavy equipment which would have indicated Tank removal.

Baker explained that if a responsible party wanted to permanently close storage tanks, they would have to first contact a certified tank remover. Baker indicated that Fulton had contacted the company, Claymore Environmental, LLC (Claymore), which Baker confirmed was a certified tank remover. Baker stated that in May 2025, the Department received three e-mails from Fulton, *see* Exhibits DEP-2-4, each of which Baker read into the record, and are summarized as follows:

- On May 14, 2025,[10] the Department received an e-mail from Fulton with the subject line, "Underground storage tank removal, 1324 East Washington Lane, Philadelphia, PA 19138. PA DEP Facility ID 51-45480," which included a picture of a **2023** proposal for Tank removal from Claymore. *See* Exhibit DEP-2 (Fulton's 5/14/2025 E-mail to the Department forwarding 10/23/23 Claymore Tanks Removal Proposal, signed by Fulton on 5/14/2025, as Corporate Respondent "Treasurer"). Baker verified the identification number

[10]This was the day before the Court held a pre-hearing status conference on May 15, 2025.

in this subject line corresponds with the number the Department assigned to Corporate Respondent. The proposal indicated the overall cost for Tanks removal was $24,475, with the following payment structure: a $5,000 down payment at the time of signing, and five monthly payments of $3,895. According to the proposal, the first payment was due the first of the month starting January 1, 2024, through May 1, 2024.

- On May 16, 2025, the Department received an e-mail from Fulton stating Claymore increased the down payment by $5,000 and that Fulton needed until next week because the down payment had increased to 50% and the overall price had increased by $1,500, as well. *See* Exhibit DEP-3 (Fulton's 5/16/2025 E-mail to the Department regarding Claymore's Updated Prices).

- On May 19, 2025, Fulton e-mailed the Department stating he was working on "Plan A" to remove the Tanks[11] which would cost an additional down payment of $5,000 and 50% increase, as opposed to the agreement he signed already. *See* Exhibit DEP-4 (Fulton's 5/19/2025 E-mail to the Department regarding Claymore's Updated Prices). In the e-mail, Fulton asked for the end of the week so that he could sign an updated agreement with Claymore.

Baker confirmed the Department did not receive any further communication from Corporate Respondent or Fulton beyond the last e-mail. Based on the May 2025 e-mails, Baker understood that Claymore provided an October 23, 2023 proposal to Corporate Respondent for removal of the Tanks and associated piping and equipment on the Property, work which was consistent with that required by the Contempt Order. Baker believes that on May 14, 2025, Fulton signed the 2023 proposal from Claymore and e-mailed the Department a picture of the signed proposal that same day. Baker understood that Fulton subsequently received an updated 2025 proposal from Claymore to perform the Tanks closure work, with updated pricing, increasing the down payment from $5,000 to $10,000 and the

---

[11]This purportedly refers to the settlement presentation the Department made to the Court during the May 15, 2025 settlement conference, which entailed a "Plan A," Corporate Respondent to close the Tanks by itself, and "Plan B," to produce financial documentation to the Department for Tanks closure.

overall price of the work by $1,500. The Department never received a copy of the updated 2025 proposal from Claymore but Baker calculated the new total cost for the updated pricing, based on Fulton's e-mails, to be $25,975. Baker stated that she would expect a certified tank installer to update its payment terms in 2025 for a 2023 proposal, noting that prices change over time.

Baker testified that while this updated total cost was within the ballpark estimated cost for a member of the public to contract with a certified tank remover to permanently close three storage tanks, the figure was less than what she would expect for this work to be completed. Baker explained that when an owner cannot afford to remove tanks themself, the Department may step in to close the Tanks, by utilizing state funds. To trigger this action, Baker testified the Department must receive formal documentation of an owner's qualifying financial circumstance, indicating the owner cannot fund the work themselves. This financial proof is required by the Department so it does not unnecessarily expend taxpayer dollars. Baker explained the work would cost more than $25,975 for the Department to contract with a company to perform closure of the Tanks, because utilization of state funds in state contractual jobs involves more stringent requirements and usually leads to substantially higher prices than had a private owner contracted with a company to complete the work themself.[12]

Baker verified that if the Department performs state-led corrective action and contracts with a certified tank remover to permanently close storage tanks, it can recover the costs from a responsible party by placing a lien on the property after the work is completed. Baker noted that Fulton did not indicate Corporate Respondent could not afford the new down payment or the new overall

_____

[12]Baker clarified that she had not asked Claymore to assess what the cost would be for the Department to close the Tanks itself.

15

cost in any of the May 2025 e-mails. Further, Baker testified Corporate Respondent has never informed the Department it was not able to afford permanent closure of the Tanks and has never given the Department a reason to believe it could not do so. Baker stated that rather than indicate he did not have the monies to comply with the Contempt Order, Fulton signed a proposal with Claymore to perform the work required by the Contempt Order.

Baker confirmed the Department has invited Corporate Respondent to provide the required financial documentation to support a claim of its inability to comply to allow the Department to close the Tanks, but that Corporate Respondent has never done so. *See* Exhibit DEP-5 (the Department's Notice of Violation, 12/29/2016, and the Department's internal Phone Conversation Log of "Conservation Notes," recorded from a 1/5/2017 Phone Call with Fulton). Baker read a portion of Exhibit DEP-5, the December 29, 2016 Notice of Violation, into the record, which requested Corporate Respondent produce documentation of its financial resources by January 30, 2017, if Corporate Respondent believed it did not have enough money to fund closure of the Tanks, so the Department could assess the business's eligibility for a state-funded Tanks closure.

Baker also discussed a phone log Baker had prepared from a January 5, 2017 telephonic conversation with Fulton, in which Baker advised that if Corporate Respondent cannot afford to close the Tanks, Fulton should submit the financial documents listed in the Notice of Violation. *See* Exhibit DEP-5. At the time, Fulton never indicated to the Department that he could not afford the permanent Tanks closure. Baker stated the Notice of Violation and phone log show Fulton has known since 2016 that Corporate Respondent could submit financial documentation to the Department if it could not afford to close the Tanks. Baker said she contacted Fulton

16

multiple times throughout these proceedings, including up through the enforcement proceeding, and that each time, Fulton indicated he was working toward closure of Tanks by getting pricing and quotes from tank removal companies. Baker stated that she was never led to believe by Fulton that Corporate Respondent could not afford to permanently close the Tanks.

Baker also spoke to ownership questions regarding the Property and confirmed the Department's awareness that Fulton had transferred the Property to his daughter and that the Property was simultaneously listed for a sheriff's sale and for sale on the private market. *See* Exhibit DEP-6 (Deed of Property Conveyance from Fulton to Sabreea T. Alastair for $1.00, 1/13/2025, and Philadelphia Real Estate Transfer Tax Certification, 1/13/2025). Regarding the Property transfer, Baker testified that the Property had a fair market value of $130,005. Baker explained that on January 13, 2025, Fulton transferred the Property to his daughter, Ms. Alastair, for $1, claiming a 100% exception for a transfer between related parties, from father to daughter. Baker stated that by transferring the Property to his daughter for $1, rather than attempting to sell it at or above its fair market value, Fulton eliminated a potential revenue stream to fund the Tanks closure.

Baker explained that a change of storage tank ownership must be filed with the Department and that to date, the Department has not received an amended registration form reflecting a change of Tanks ownership. Accordingly, Baker stated that Fulton remains the owner of the Tanks. Concerning the sheriff's sale, Baker stated that, from an online search, she learned the Property is scheduled for a sheriff's sale on August 20, 2025, the day after the hearing. *See* Exhibit DEP-7 (8/1/2025 Screenshot of Philadelphia County Sheriff Sale of Property). Moreover, she explained the Property is also listed for a private sale, and that the listing for real

estate sale of the Property, identified ColdwellBankerHomes.com as the broker, listed the price of sale at $600,000, and was last updated on August 3, 2025. *See* Exhibit DEP-8 (8/4/2025 Screenshot of Private Real Estate Listing of Property). The posting description also indicated "price reduction" and "for a quick sale."

Further, Baker discussed Corporate Respondent's articles of incorporation, which show Corporate Respondent was incorporated on May 14, 1992, by Fulton, the incorporator and president, who signed the articles. Corporate Respondent is identified by entity number 2090404 and as a "business stock" type of corporation. *See* Exhibit DEP-9 (Corporate Respondent's Articles of Incorporation filed with Department of State, 5/14/1992). Therein, the Property is listed as Corporate Respondent's address. The articles also indicate that Fulton purchased a hundred shares for himself and do not indicate there are any other shareholders. Additionally, Baker testified that she conducted a business search with the Department of State, which reflected the same date of incorporation, entity number, Property address, and similarly lists Fulton as the President and Treasurer of Corporate Respondent. *See* Exhibit DEP-10 (8/1/2025 Screenshot from Department of State website). Corporate Respondent is listed in "Active" status; however, an outstanding annual report due June 30, 2025, is noted, reflecting Corporate Respondent is not up to date on its corporate filings.

Finally, Baker testified the Department would not allow anyone, including Corporate Respondent, to operate the Tanks now because they are outdated and do not meet the Department's performance standards for regulated storage tanks. Baker explained the Department would have concerns about placing product into the Tanks after they have been sitting without product in them, because they are made of fiberglass material and there would be a likelihood the Tanks could fail, rupture,

18

and cause releases. Baker explained that problems can arise when out-of-service storage tanks are not permanently closed, because without a removal and site assessment of the tanks—which involves sampling soil around the excavated tank area in certain locations at certain depths— the Department has no way of knowing whether there has been a release underground from the systems. If groundwater is encountered, Baker stated, it must be sampled as well, to indicate whether there is contamination from any releases into the groundwater. Until the Tanks go through permanent closure, the Department has no way of knowing what is happening underground. While the Tanks remain underground not properly closed, they are still accessible, so someone could place product in the Tanks until they are removed, Baker stated. The Court finds all of Baker's testimony credible.

Buterbaugh's Testimony

Buterbaugh is an Investigator with the Department's Bureau of Investigations. He has worked for the Department for 24 years, 14 years of which he has held his current position. In this role, Buterbaugh provides support to Department programs that have investigative needs such as surveillance, interviewing, collecting evidence, and serving legal documents. Buterbaugh's testimony focused on service. Buterbaugh stated that he knows what Fulton looks like based on previous personal service encounters in this case. Additionally, the Department has confirmed Corporate Respondent's address, the Property, through Department of Motor Vehicle registry. Specifically, Buterbaugh testified that he personally served the Contempt Order on Corporate Respondent, via Fulton, at the Property on September 12, 2024, and that the Department also served the Contempt Order on Corporate Respondent via first-class mail and by e-mailing Fulton. *See* Exhibits DEP-11 (Affidavit of Return of Personal Service of Contempt Order,

19

9/12/2024) and DEP-12 (Proof of Service of Contempt Order by First-Class Mail and E-Mail, 8/15/2024).

Buterbaugh similarly testified that on August 5, 2025, he personally served Corporate Respondent with the Court's May 2, 2025 Order (which scheduled the August 19, 2025 hearing), though he had some difficulty effectuating personal service that day, but ultimately left the Order with another individual at Corporate Respondent. *See* Exhibit DEP-13 (Affidavit of Return of Personal Service of the Court's May 2, 2025 Order, 8/5/2025). *See also* Exhibit DEP-14 (Proof of Service of May 2, 2025 Order by First-Class Mail and E-Mail, 5/6/2025). The Court finds Baker's testimony to be credible on the facts set forth above.

Fulton's Testimony

After some hesitation, Fulton engaged in colloquy with the Court on Corporate Respondent's ability to comply and the following information was elicited from Fulton during a colloquy with the Court about Corporate Respondent's ability to comply, some of which was intimated during a closed session proceeding (private session),[13] and the Department's cross-examination of Fulton. Mainly, during this colloquy, Fulton pleaded with the Court for additional time to accumulate enough money to close the Tanks. Fulton testified his brother initially agreed to help him financially by breaking his 401(k). Fulton's brother, however, cannot financially help Corporate Respondent immediately due to his own personal and household expenses, but his brother is committed to providing financial assistance in the future.

---

[13]At one point, the Court directed everyone but Fulton, Department Counsel Attorney Glass, the Court Crier, and the Court Reporter, to leave the Courtroom, given Fulton's apparent hesitancy to answer questions regarding personal information about his finances. This period of the hearing will be referred to as the "private session." During this time, the Court left the bench and sat eye level with Fulton and Department counsel, then offering fuller context on what the "ability to comply" issue relates to.

Fulton stated he intended to use some of his own money and some of his brother's money to tender a deposit for a third-party contract to perform permanent closure of the Tanks. Fulton stated that while Corporate Respondent could not comply in the past, it could comply now because of the use of his personal funds and his brother's funds.

When the Court referenced the Financial Affidavit Forms attached to the Hearing Notice, Fulton claimed to have never seen them, despite the Forms having been sent by first-class mail and e-mail prior to the hearing. Given this representation, the Court provided Fulton with a copy of each Form at the hearing. Fulton requested 14 days to complete and submit the Forms to the Court, which the Court denied because the Court had been in communication with the parties by e-mail and knew Fulton reliably used his e-mail. The Court compromised by agreeing to colloquy with Fulton on the information on the Forms by reading through each line of each Form, and invited Fulton to answer questions about the Forms during the colloquy.

Concerning the Business Financial Affidavit Form, Fulton stated that Corporate Respondent is an auto-repair business that nets approximately $2,000 monthly. On cross-examination, Fulton elaborated there are "good" and "bad" months in business, and that sometimes, Corporate Respondent may net $500 a week and/or $3,000-$4,000 monthly. Fulton explained he must hold funds from more profitable months, as not all months are the same. Fulton testified that Corporate Respondent does not have its own bank account. The business does not have lines of credit or other avenues for funding and is not in receipt of governmental funding

or low interest rate loans.[14]   There are no shareholders or other owners of the business, besides Fulton.  Fulton stated that while Corporate Respondent does not have official employees, there are several individuals Fulton referred to as "helpers," that assist him with the business.  Fulton testified that he does not pay these "helpers" for their assistance.  Fulton does everything for the business including, selling new and used tires, repairing cars and breaks, and providing vehicle tune-ups.  Fulton could not recall Corporate Respondent's precise income last year but stated the business operated at a financial loss and that he did not file a state or federal tax return for the business last year.

Fulton identified the following business inventory and estimated values: used tires ($2,500); drum oil ($400); batteries ($1,000 total; $250 per battery); tire machine (at least $8,000).  After some confusion, Fulton clarified on cross-examination that despite the business having operated at a financial loss last year, Fulton had no intention of selling Corporate Respondent or winding down the business.  If all else fails, Fulton could entertain selling the previously-identified inventory, he stated, but he had no plan to do so.  Rather, Fulton testified that he needed to continue running the business to eat and survive.

Regarding the sheriff's sale, Fulton indicated his father, since deceased, owned the Property.  Upon his father's death, Fulton's mother took over the Property, however, Fulton testified his mother suffered from dementia and began hiding bills. Fulton explained that it was only upon his mother's passing that he learned the magnitude of the financial situation regarding the Property.  Fulton transferred the Property containing the Tanks to his daughter, Ms. Alastair, for $1 in the hopes she

---

[14]Fulton testified that he applied for a grant for Corporate Respondent during the COVID-19 pandemic but that the grant was withheld because Corporate Respondent did not produce a tax return.

could stave off the sheriff's sale by paying the unpaid property taxes. Fulton claims his daughter stopped the sheriff's sale on two prior occasions, and that she required transfer of the Property as collateral, rather than lending money to Fulton outright. Fulton does not believe his daughter would transfer the Property back to him, citing familial and personal reasons. Fulton stated that he believes his daughter would allow him to physically enter the Property, though he is not certain that she would grant the Department entry on the Property to close the Tanks.

Fulton paused the colloquy to emphasize to the Court if he personally had the funds, he would have already resolved this situation for Corporate Respondent, which has been a personal headache and aggravation for Fulton. Fulton stated he would not have put the Court in this situation by not having the Tanks permanently closed, if Corporate Respondent could have done so. Fulton noted there are other expenses he has to pay like taxes and things of that nature, but did not elaborate. Fulton also stated that he paid someone to perform pressurized testing on each of the Tanks.

Regarding his individual expenses as per the Individual Financial Affidavit Form, Corporate Respondent is Fulton's only source of income. Fulton has grocery, utility, and housing payments. Fulton rents his home and has a monthly rent payment of $1,500, which he splits with his girlfriend, with whom he resides. Fulton owns one car, a 2007 White Cadillac, with a hundred thousand miles on it, and he also owns a plow. Fulton has seven children. He does not pay child support. Fulton also stated that he financially helps one of his daughters—who is not the same daughter to whom he transferred the Property—and specifically, this daughter's 8- and 10- year-old children, Fulton's grandchildren, by assisting with their clothing. Fulton explained he has a bit of money in savings and checking, which he specified

in the private session. Fulton stated he has good health and does not have atypical medical expenses. Despite having a $500 line of credit, Fulton said he does not use his credit cards.

Fulton said that when he went to sign an agreement with a third-party Tank removal company, the down payment deposit was originally $5,000, however, it has since jumped to $13,000, and then to $18,000. Fulton claims Corporate Respondent had enough money to pay the original $5,000 deposit, but the price changed. Fulton explained that from his perspective, the Department is asking too much from him and has essentially moved the goal posts regarding the Tanks. He stated that in 2016 and 2017, the Department's goal for Corporate Respondent was to inspect, not remove the Tanks, and Fulton had intended to use the Tanks again to sell gasoline. Fulton claims the agency's goal evolved after the COVID-19 Pandemic, when he first learned of the requirement to close the Tanks.[15]

Fulton testified that he did not communicate Corporate Respondent's inability to permanently close the Tanks to the Department previously because Fulton was trying to get things done during this time. Fulton indicated that he inquired several companies for Tank removal/putting new Tanks in, one of which, came to the Property for an evaluation, however, quoted a price of around $300,000. As developed *infra*, the Court credits Fulton's testimony in part.

2. Sanctions

When the Court returned from the private session, the Department requested to move forward with sanctions. Department counsel argued that the evidence and testimony supports the imposition of sanctions. The $100 daily fine is appropriate, the Department averred, and was *compensatory* in nature. As further

_____

[15]The Department rejected this narrative, citing the 2016 Notice of Violation which was issued for Corporate Respondent's failure to permanently close the Tanks.

support, the Department contended that Fulton took steps toward compliance by signing a stipulation committing Corporate Respondent to Tank closure in 2023; soliciting a proposal with a third-party company to complete the work; and signing the proposal during the contempt phase. According to the Department, these are not the actions of a principal officer whose corporation does not have the ability to complete the work but rather, of someone who understands how to bring his business into compliance but simply does not do so. The Department points out that nevertheless, Corporate Respondent declined the Department's multiple invitations to submit financial documentation proving its inability to comply. If the Corporate Respondent could not comply, it could have said so years ago, the Department posited, rather than force the Department into expending significant resources to compel compliance. Corporate Respondent's actions have delayed necessary work to ensure contaminations haven't been released that could be harmful to humans and the environment. For these reasons, the Department believes a $100 daily compensatory fine is wholly appropriate, totaling a civil contempt sanction of $25,500.[16]

The Department did not at this time specify the precise nature of subsequent sanction it would be seeking, beyond its subsequent written request via Post-Hearing MOL following the hearing, for entry of judgment on the aforementioned sanction.

---

[16]The Department calculates this number at $25,500, rather than $35,000, as had been previously noted by the Court.

## III.    DUE PROCESS CHALLENGES[17]

In its Post-Hearing MOL, the Department states it has "no objections" to the Court's imposition of the *Turner* comports (in fact, to the extent it minimizes the number of contempt/sanctions petitions filed and the delay to environmental compliance, the Department "welcomes" the changes). Dep't Post-Hr'g MOL, 9/2/25, at 2. The Department does, however, challenge *how* the Court has or will implement the new due process protections. *Id.* Accordingly, the Court upholds the *Turner* four due process comports imposed by the August 5, 2025 Opinion and Hearing Notice. *See* 210 Pa. Code §69.414(b) (governing the persuasive, not controlling value, of single-Judge Opinions). In turn, the Court focuses its due process discussion on the Department's contentions regarding *how* the due process comports have or will be implemented.

The Department contests the scope of Fulton's participation in the hearing, namely the Court permitting Fulton to provisionally cross-examine Department witness, Baker, on Baker's statements regarding Corporate Respondent's ability to comply. The Hearing Notice explicitly prohibited Fulton's cross-examination of any Department witnesses, by ordering:

> Without counsel, Fulton is not permitted to take any other action **on behalf of Corporate Respondent** that is not expressly directed by this Memorandum and Order, including but not limited to, presenting witnesses, **cross-examining Department witnesses**, formally making arguments before the Court, or filing a motion, brief, or any evidence other than the Financial Affidavit Forms and supplementary documentation.

---

[17]Corporate Respondent and Fulton were afforded the opportunity to file post-hearing briefs/legal memoranda and did not elect to do so. *See* Cmwlth. Ct. Hr'g Notice ¶56.

Cmwlth. Ct. Hr'g Notice ¶24 (emphasis added). At the hearing, the Court departed from the latter bolded language, upon the unfolding of the reality of the moment.

In its Post-Hearing MOL, the Department represents it does not oppose the Court affording a corporate officer the opportunity to colloquy about Corporate Respondent's "present ability to comply," but does object to a non-attorney corporate officer cross-examining agency witnesses. Dep't Post-Hr'g MOL at 4. Businesses that receive the benefits and protections of incorporation must bear the legal burdens of representation, the Department avers. *Id.* at 4-5 (citing *Spirit of the Avengers Ministries*, 767 A.2d at 1130-31. The Hearing Notice, the Department posits, struck an "acceptable balance between two competing interests" and the Court's "supris[ing]" deviation from its notice contravened case law, which typically affords courts "no discretion to tolerate [] unauthorized practice of law." *Id.* at 5-6 (quoting *Bisher v. Lehigh Valley Health Network, Inc.*, 265 A.3d 383, 406 (Pa. 2021)). The Department asks the Court to strike and disregard Baker's testimony that was elicited during Fulton's cross- examination, and further, requests the Court curtail participation of unrepresented corporate respondents in future proceedings.

The Court understands the Department's position and appreciates that the Court's allowance of Fulton's cross-examination of Baker seemingly deviated from the Hearing Notice. **However, the reason for allowing Fulton to cross examine was not for purposes of protecting Corporate Respondent but rather because incarceration for Fulton could be imminent.** *See* Cmwlth. Ct.'s Mem. Op., 8/5/25, slip op. at 7 ("[A]lthough incarceration ruminates in the background even at the initial proceeding (*i.e.*, the enforcement stage), it is only at the contempt stage, where the dark shadow threat of jail reaches the light of day and can no longer be avoided."); *see id.* (quoting *Maggio v. Zeitz*, 333 U.S. 56, 76-7 (1948) ("At that

27

stage [the contempt stage], imprisonment is not only probable and foreshadowed — it is imminent. And, without such a weighing [of careful balancing], it becomes inevitable.")). Baker testified about Corporate Respondent's ability to comply, and while Fulton's incarceration was not going to result from the August 19, 2025 hearing, his incarceration was looming in the background. Because Baker testified about Corporate Respondent's ability to comply, it raised a question of whether forbidding Corporate Respondent to respond, via Fulton, contravened *Turner*, namely the third of the *Turner* four comports, which provides "an opportunity at the hearing for the defendant to **respond to statements and questions about his financial status** (*e.g.,* those triggered by his responses on the form). . . ." *Turner*, 564 U.S. at 447-8 (emphasis added). If and when the time comes to consider Fulton's incarceration, the Court pondered whether it will be considering only the evidence at *that* sanctions hearing or whether the Court will be called upon to consider all evidence it has obtained as it journeyed through this litigation with the parties. Thus, the Court ruled on the side of caution in allowing Fulton to cross-examine Baker on questions specifically concerning Corporate Respondent's ability to comply.

Ultimately, because Fulton's personal liberty was not at risk at the purge/sanctions hearing, the Court sustains the Department's objection and will not consider any evidence Fulton elicited on behalf of Corporate Respondent during Fulton's cross-examination of Baker. The Court, however, declines the Department's request to strike the testimony from the record. At a future proceeding, if any, where sanctions are sought against Fulton himself, Fulton will have the chance to represent himself. *See* Cmwlth. Ct. Hr'g Notice ¶57("If this contempt proceeding reaches the stage where Fulton may be personally sanctioned for

28

Corporate Respondent's contempt, Fulton can represent himself '*pro se*.'"). Until then, the Court upholds its utilization of a provisional colloquy, under *Turner*, to elicit information regarding the "ability to comply," as case progression may otherwise not be possible.[18]

IV. **DISCUSSION**

Preliminarily, the Court addresses the numerous issues with ownership regarding the Property, the land on which the Tanks are located. In April 2025, the Court directed briefing, *inter alia*, on the issue of Property ownership and how it may affect the case. In its Post-Hearing MOL, the Department informed the Court the Property was sold on August 20, 2025, the day after the hearing, at a Philadelphia County Sheriff Sale for $92,800, for unpaid taxes. Dep't Post-Hr'g MOL at 8 n.5; *see id*. (Attachment B, Screengrab of Sheriff's Sale of Property from "Bid4Assets.com.").

---

[18]The Department raises two additional arguments in its Post-Hearing MOL. First, it argues the Department should not have to "further justify" the effectuation of the $100 daily fine previously imposed as a civil contempt sanction by the Contempt Order. Dep't Post-Hr'g MOL, at 3. In retrospect, the additional *Turner* due process comports should have been in place in the Court's entry of its Contempt Order. In future matters, the due process comports should be implemented no later than the first civil contempt proceeding. *See* 210 Pa. Code §69.414(b) (governing the persuasive, not controlling value, of single-Judge Opinions). Where neither party has requested this Court vacate its prior Contempt Order nor sought reconsideration thereof, the Court will neither revisit the Contempt Order nor the imposition of a $100 daily fine therein.

Second, the Department argues implementation of additional due process comports may delay environmental compliance which could implicate the public's constitutional rights under the Equal Rights Amendment to clean air, pure water, and the preservation of environmental resources. Dep't Post-Hr'g MOL at 7 n.2 (citing PA. CONST. art. 1 §27). The underlying violative conduct implicates serious concerns that affect the health and safety of persons and the environment. Here, the initial violation first occurred in 2003. Thirteen years later, the Department issued a notice of violation against Corporate Respondent. Twenty years after the initial violation, the Department brought the enforcement action in this Court. While the Court appreciates the Department's argument in the abstract, it does not find it necessary to further analyze it with respect to this case.

29

Section 1302(a) of the Act states that where the Department finds "a release or danger of a release" from a storage tank, the Department "may order the **owner, operator, landowner or occupier** to take corrective action in a manner satisfactory to the department, or it may order such **owner, operator, landowner or occupier** to allow access to the land by the department or a third party to take such action." 35 P.S. §6021.1302(a) (emphasis added). Section 1310 of the Act also states "[t]he **owner or operator of a storage tank and the landowner or occupier on whose land a storage tank is or was** located shall not allow pollution resulting from, or a release to occur from, a storage tank." 35 P.S. §6021.1310 (emphasis added). The Act explicitly requires "[e]very owner of an underground storage tank" to "register" the tank with the Department and provides that "[i]t shall be unlawful for any owner or operator to operate or use, in any way, any underground storage tank that has not been registered as required by this section." 35 P.S. §6021.503.

The statutory emphasis extends to landowners and current occupiers, but also rests with the "owner or operator" *of the storage tanks*. *See* 35 P.S. §6021.1310. In the Contempt Order, the Court named Fulton as the owner/responsible party (in other words, "operator") of the Tanks. *See* Cmwlth. Ct. Contempt Order, 8/15/24, ¶3. At the last hearing, Baker testified that Fulton remains the owner/operator of the Tanks and that no new amended certification form regarding ownership has been filed with the Department. Thus, at this moment, the Court finds that Fulton remains the owner/operator of the Tanks; and because Fulton registered the Tanks in his capacity as a principal officer of Corporate Respondent, Corporate Respondent remains liable for Tanks' closure. Accordingly, the Court finds the sale of the Property did not moot the current contempt action against Corporate Respondent.

30

## A. Department's Burden

The Court will first issue a ruling on contempt and then address sanctions. As the complainant, the Department has the initial burden of proving civil contempt by a preponderance of the evidence. *Barrett v. Barrett*, 368 A.2d 616, 621 (Pa. 1977). A preponderance of the evidence is the lowest evidentiary burden that exists and "tantamount to a 'more likely than not' inquiry." *Pa. State Police v. Doe*, 217 A.3d 455, 464 (Pa. Cmwlth. 2016) (citation omitted). The standard is "not stringent" but "does require that the [petitioner's] evidence ever so slightly (like, with the weight of a feather) supports the [petitioner's] contention." *Povacz v. Pa. Pub. Util. Comm'n*, 280 A.3d 975, 1006–07 (Pa. 2022). In the contempt context, "[m]ere noncompliance with a court order is not by itself sufficient to prove contempt[.]" *Waggle v. Woodland Hills Ass'n Inc.*, 213 A.3d 397, 403 (Pa. Cmwlth. 2019). The complaining party must prove 1) the contemnor had notice of the specific order it is alleged to have disobeyed; 2) the act constituting the contemnor's violation was volitional; and 3) the contemnor acted with wrongful intent. *Id.*

Beginning with the first factor, "[a] person may not be held in contempt of court for failing to obey an order that is too vague or that cannot be enforced." *Lachat v. Hinchcliffe*, 769 A.2d 481, 489 (Pa. Super. 2001).[19] Notice must be "clear, definite, and specific—leaving no doubt or uncertainty" as to what is required from the defendant. *Stahl v. Redcay*, 897 A.2d 478, 489 (Pa. Super. 2006). The order must be "strictly construed," and "any ambiguities or omissions in the order must be construed in favor of the defendant." *Id.* Here, the Contempt Order left nothing to chance. It explicitly stated:

---

[19]Though not binding on the Court, where persuasive, the Court may adopt the Superior Court's reasoning. *Taylor v. Pa. State Police of Commonwealth*, 132 A.3d 590, 603 n.15 (Pa. Cmwlth. 2016).

31

4. By October 7, 2024, Respondent shall, in accordance with 25 Pa. Code §§ 245.452, 245.453, and 245.455, permanently close the storage tank systems and complete a site assessment at the automobile service center and former retail gasoline station located at 1324 East Washington Lane in the City of Philadelphia, Philadelphia County, registered with the Department under the name Fulton Service Station, Facility Identification Number 51-45480.

5. By November 4, 2024, Respondent shall amend the registration for the storage tanks systems to reflect permanent closure, prepare a complete closure report, and submit both the amended registration and closure report to the Department in accordance with 25 Pa. Code § 245.452.

6. If contaminated soils, contaminated groundwater or free product as a liquid or vapor is discovered during permanent closure or site assessment activities, Respondent shall complete corrective action in accordance with 25 Pa. Code Chapter 245, Subchapter D, §§ 301 – 314 (relating to corrective action process for owners and operators of storage tank facilities and other responsible parties).

Cmwlth. Ct. Contempt Order, 8/15/24, ¶¶4-6.

Moreover, Buterbaugh testified that he effectuated service of the Contempt Order on Corporate Respondent by mail, e-mail, and personal service of Fulton, and this credible testimony, which was corroborated through Exhibits DEP-11 through DEP-14, was not refuted. Where the notice through the Contempt Order was clear and the Department represented unrefuted testimony and exhibits showing it was properly served, the Court concludes this element is satisfied.

Second, the Department must demonstrate Corporate Respondent's noncompliance was volitional, meaning it was willful. "Civil contempt may be proved by circumstantial evidence and logical inference from other facts." *Holtzapple v. CJD Group, LLC* (Pa. Cmwlth., No. 1114 C.D. 2017, filed Oct. 31,

32

2016), slip op. at 6 (unreported). Baker credibly testified, and corroborated with Exhibit DEP-5, that the 2016 Notice of Violation advised Corporate Respondent to submit financial information to the Department for Tanks closure if it could not afford to close the Tanks, and that that Baker reiterated this message to Fulton during a 2017 phone conversation. Baker also credibly stated that each time the Department spoke with Fulton throughout the course of the proceedings, Fulton indicated that he was working toward Corporate Respondent's compliance. This evidence demonstrates the Department presented the option to Corporate Respondent to submit financial information if it could not afford to permanently close the Tanks as early as 2016, and that Corporate Respondent did not utilize this opportunity in the almost ten years since the Notice of Violation was issued. This, coupled with Fulton's consistent assertions over the decade that Corporate Respondent was working to close the Tanks, supports a finding that Corporate Respondent knew what was required and willfully failed to comply.

Third, the Department must show that Corporate Respondent acted with wrongful intent to evade the Court's process, which can be inferred from circumstantial evidence. *Waggle*, 213 A.3d at 403. When making such a determination, "the court should use common sense and consider context, and wrongful intent can be imputed to a defendant by virtue of the substantial certainty that his actions will violate the court order." *Jordan v. Pa. State Univ.*, 276 A.3d 751, 766-67 (Pa. Super. 2022), *rearg. denied* (July 13, 2022). While Fulton has attended each Court proceeding, the Court finds credible that Fulton has made efforts to avoid and evade the Department.

Following the Stipulation Order, Fulton received a proposal from Claymore in 2023. Based on the evidence of record, Fulton did not sign this

33

agreement at the time. In May 2025, however, the day before the scheduled pre-hearing status conference, and *two years* after Fulton received the Claymore proposal, Fulton signed the 2023 proposal and sent it to the Department. This action is somewhat telling because as a business owner himself, Fulton can understand that businesses regularly update their pricing to meet the growing market and inflation, and that *a cost estimate for a service two years ago* likely would not be applicable now. Fulton nevertheless signed the 2023 proposal in 2025 and sent the signed proposal to the Department. The following day, the parties engaged in settlement discussions with one another, off-the-record, during a scheduled pre-hearing conference. Thereafter, Fulton twice e-mailed the Department indicating that Claymore's terms had been updated and requesting more time to enter into a contract with Claymore, but he never provided an updated proposal to the Department.

At the hearing, Fulton repeatedly stated that he was in possession of the updated Claymore proposal and even committed to sending the Department a copy of the updated proposal within 24 hours of the hearing. In its Post-Hearing MOL, the Department confirmed Fulton had not sent the updated proposal after the hearing, as he had promised. Fulton had the opportunity to make a showing of good faith by sending the updated Claymore proposal to the Department, as he committed to doing, but still failed to do so. Moreover, during the hearing, Fulton testified he first learned of Tank closure in 2020, despite the Department having notified Corporate Respondent of its failure to permanently close the Tanks in its 2016 Notice of Violation. Accordingly, the Court concludes that the Department demonstrated wrongful intent.

On review, the Department has made its showing of contempt, and the burden now shifts to Corporate Respondent, where it can raise, as an affirmative

34

defense, the inability to comply with the Court's Stipulation and Contempt Orders, specifically, purging itself of contempt, pursuant to the Court's Contempt Order.

## B. Corporate Respondent's Burden[20]

The Commonwealth follows *Barrett v. Barrett*, 368 A.2d 616 (Pa. 1977), which places the burden to contest ability to comply with the alleged contemnor, except in circumstances where the alleged contemnor does present evidence of its inability to comply, "the court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced [b]eyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply."[21] Cmwlth. Ct.'s Mem. Op., 8/5/25 at 3 n.4 (quoting *Barrett,* 368 A.2d at 621). In the absence of much Pennsylvania case law governing how the affirmative defense of inability to comply can be properly raised in a proceeding like this one, the Court relies on its discretion to make credibility determinations. On review, the Court makes the following factual findings with respect to Fulton's colloquy regarding Corporate Respondent's ability to comply with, *i.e.*, purge itself of, the Contempt Order:

> 1. In a tortured set of circumstances, Fulton's insistent representation that Corporate Respondent could comply with the Court's Orders if given more time to await

---

[20]The United States Supreme Court has held that a party which bears the burden of proving ability or inability to comply depends on the nature of contempt. *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624 (1988). Constitutional due process requires that for criminal contempt, the complainant must establish, as part of the *offense* of contempt, that the alleged contemnor has the ability to comply with the court's order. *Id.* at 637. For civil contempt, due process does not *require* the complainant party prove the ability to comply; instead, the alleged contemnor can prove its inability to comply as an affirmative defense. *Id.* at 637-38.

[21]Although *Barrett* predates *Hicks* and our Pennsylvania Supreme Court has not revisited *Barrett* since *Hicks*, *Barrett* comports with *Hicks* all the same.

35

financial assistance from his brother, negates Corporate Respondent's present ability to comply, as the law requires. *See Barrett.*[22]

2. While this, in other cases, may be sufficient to satisfy the affirmative defense of inability to comply with civil contempt, it does not meet the threshold here because the Court does not find Fulton entirely credible with regard to the testimony elicited from him during his colloquy with the Court and cross-examination thereof by the Department regarding the ability to comply issue.

3. The Court does not credit Fulton's testimony that he did not receive the Court's August 5, 2025 Opinion and Hearing Notice.

    a. Both documents were sent to Corporate Respondent by electronic delivery to Fulton's e-mail address and first-class mail to Corporate Respondent's address, located at the Property.

    b. Given that there has been no update from Fulton that Corporate Respondent's address has changed or that Fulton no longer utilizes his e-mail address, the record reflects the Department has personally served Fulton at Corporate Respondent's address, corroborating it is the correct address, and presented proof, via exhibit, of Fulton's recent correspondence with the Department over e-mail. *See* Dep't Exhibits DEP-2-4 (Fulton's e-mails to the Department regarding Claymore proposals in May 2025).

    c. As such, the Court does not credit Fulton's testimony that he never received the documents.

---

[22] Contempt determinations are founded in the "present" ability to comply, making an alleged contemnor's future ability to do so irrelevant. Further, the only relevant inquiry is *the alleged contemnor's* finances. The Court does not consider whether an alleged contemnor could comply by collecting money from friends and family. *See Maggio,* 333 U.S. at 64 (noting it "should not be necessary to say that it would be a flagrant abuse of process to issue such an order to exert pressure on friends and relatives to ransom the accused party from being jailed").

4. The Court does not credit Fulton's testimony that he has "helpers," several individuals, who assist Fulton with Corporate Respondent; that Fulton cannot afford to pay them for their services.

    a. When the Court asked Fulton if Fulton was a repairman, Fulton answered he was *one* of Corporate Respondent's repairmen.

    b. This was revealing that Fulton considers the other individuals who "help" Corporate Respondent also to be repairmen.

    c. When the Court attempted to clarify whether these individuals provide help to Corporate Respondent for free, Fulton evaded that characterization, indicating the helpers are men Fulton knows, who come around the shop.

    d. Though volunteering is a legitimate practice, given the circumstances of this case—where Corporate Respondent's (financial) ability to comply with the Court's Contempt Order is in direct question— Fulton was unable to provide additional detail of this situation to corroborate his testimony in a credible way.

    e. Thus, the Court does not believe that Corporate Respondent has "helpers" on an ongoing basis who work as employees without any compensation or benefit.

5. The Court does not credit Fulton's testimony that he first learned the Department was pursuing closure of the Tanks following the COVID-19 pandemic.

    a. The Department issued a Notice of Violation to Corporate Respondent on December 29, 2016.

    b. The Notice of Violation states, "[b]ased on the information gained during [a recent site] visit,

and a subsequent review of [the Department's] records associated with [Corporate Respondent's] facility, **[the Department] requests permanent closure of the [T]anks**." Exhibit DEP-5, Notice of Violation, 12/29/16, at 1.

c. Fulton, has repeated, even as recent as the August 19, 2025 hearing, his intention for Corporate Respondent to put the Tanks back into service.

d. While Fulton has been attempting to collaterally attack the underlying Administrative Order with a stated intention to resume using the Tanks, the clear directive from the Department, as corroborated by testimonial and documentary evidence, was always for Corporate Respondent to permanently close the Tanks.

6. Moreover, Fulton is not credible regarding the updated proposal with Claymore.

a. Baker testified that Fulton informed the Department that the down payment increased from $5,000 to $10,000 for the contract with Claymore for Tanks removal.

b. To corroborate her testimony, the Department produced evidence of Fulton's e-mails to the Department stating the same. *See* Dep't Exhibits DEP-2-4 (Fulton's e-mails to the Department regarding Claymore proposals in May 2025).

c. At the hearing, Fulton stated that the price for the down payment had increased to $18,000. Fulton offered no corroboration for this statement.

d. Additionally, Fulton committed, under oath at the August 19, 2025 hearing, to providing the

Department with the updated Claymore proposal by end of day August 20, 2025, however, according to the Department's Post Hearing MOL, he never did so. *See* Dep't Post-H'rg MOL at 8 n.4.

7. Throughout the colloquy, Fulton repeatedly emphasized he was a man of his word and agreed, under oath, to send the Department 1) the updated Claymore proposal the following day, and 2) two bank statements (one for each of his bank account statements) within 30 days, but preferably sooner. As stated, the Department verified Fulton did not tender the updated proposal, and at the time the Department filed its Post-Hearing MOL, with about two weeks remaining on the 30-deadline, it had also not received the bank statements. Dep't Post-Hr'g MOL at 8 n.4. The Department has not since filed anything with the Court indicating that it received the bank statements from Fulton.

8. Fulton *did* ultimately allegedly reveal how much money was in his two bank accounts during the private session. These numbers reflected less than either the $10,000 (Baker's testimony) or $18,000 (Fulton's testimony) down payment for the Claymore agreement.

9. However, despite this, Fulton failed, in his colloquy, to prove to the Court that it would be impossible for Corporate Respondent to purge itself of civil contempt. *See Dep't of Enviro. Prot. v. Takona Oil Company and Osborne* (Pa. Cmwlth., No. 781 M.D. 2018, filed Oct. 13, 2020), slip op. at 4 (single-Judge Opinion) (Wojcik, J) (reviewing *Ramey Borough v. Dep't of Enviro. Resources*, 351 A.2d 613, 614 (Pa. 1976)).

Upon review, the Court does not believe that raising the affirmative defense of present inability to comply requires stating certain "magic words" on the record, particularly from uncounseled individuals engaging in colloquy with the Court. Where however, the Court does not find a witness to be credible,

39

documentary evidence must also be presented in support of the witness's statements to support an inability to comply. If, however, the Court were to find a witness credible, verbal testimony or the Financial Affidavit Forms alone, may be sufficient to satisfy the affirmative defense.

In this case, despite the Court's painstaking efforts to make Corporate Respondent aware that it could present the affirmative defense of its inability to comply and providing Corporate Respondent with an opportunity to raise such defense, Fulton, during his colloquy with the Court, resisted satisfying the defense.[23] *See* Dep't Post-Hr'g MOL at 7 n.4 (averring that Corporate Respondent "did not even assert an affirmative defense of present inability to comply at the August 19, 2025 hearing, despite multiple invitations from this Court."). Ultimately, the Court did not find Fulton entirely credible, so documentary evidence was needed to support his assertions that he did not have enough money to permanently close the Tanks. Had Fulton submitted a bank statement to the Department, as he committed to doing

---

[23]In its August 5, 2025 Memorandum Opinion and corresponding Hearing Notice, the Court advised that the ability or inability to comply with the Court's Orders would be a "critical" issue at the upcoming proceeding. The Hearing Notice laid out, in extensive detail, a step-by-step framework for the hearing and afforded Corporate Respondent a provisional exception to present a corporate officer, Fulton, to colloquy with the Court regarding the ability to pay, whereby Corporate Respondent would not otherwise be able to speak in the Court without counsel. Attached to the Hearing Notice were Financial Affidavit Forms, one for Corporate Respondent and one for Fulton. The Hearing Notice invited Corporate Respondent to complete and send the Forms to the Department several days before the hearing, and to bring the Forms to the hearing. The Court intentionally placed the Forms at the beginning of the Hearing Notice to ensure they would not be overlooked. The Court sent the Opinion and Hearing Notice via first-class mail to Corporate Respondent's address and by e-mail to Fulton. Corporate Respondent never submitted the Forms to the Department before the hearing.

At the hearing, the Court invited Fulton to colloquy with the Court about Corporate Respondent's ability to comply with the Court's Orders and again reiterated that the inability to comply was an affirmative defense to be raised by Corporate Respondent. At the hearing, Fulton feigned ignorance of the Forms, indicating he had never seen them. The Court then provided Fulton with copies of the Forms to review. While the Court denied Fulton additional time to review the Forms, since they had already been provided and the Court did not find credible that Fulton did not receive the Forms, the Court reviewed the Forms, line-by-line with Fulton on the record.

within 30 days of the hearing, the Court may have been able to find that the affirmative defense had been met.[24] However, despite Fulton's promise, no bank statements, like the Claymore Agreement, were ever provided.

Perhaps, at a future hearing, if and when the Court considers **whether to incarcerate Fulton as a civil contempt sanction**, Fulton may be more willing to produce documentary evidence of Corporate Respondent's financial situation. At this time, however, the Court finds Fulton's testimony alone lacked pertinent credibility and did not amount to sufficient evidence to establish the affirmative defense of Corporate Respondent's inability to comply. As such, Corporate Respondent remains in civil contempt.

### C. Sanctions

Here, the Court is in a bit of a precarious situation as there has been no new articulation of sanctions by the Department, beyond its previous request for incarceration, which the Court indicated it would not consider at this time, in light of implementation of the new due process protections.[25] *See* Cmwlth. Ct. Hr'g Notice ¶10. The Court explicitly noted it would not be considering incarceration at this stage in the Hearing Notice and permitted the Department at the purge/sanctions hearing to advise the Court of its request for new sanctions. In turn, the Department rested on its request to enter judgment on the previously-imposed $100 daily fine. Because the Department seeks only effectuation of the previously-ordered fine, the Court will enter judgment on the previously-ordered $100 daily fine now, for

---

[24]Similarly, the Department indicated that if it saw the bank statements supported Fulton's representations, it would concede Corporate Respondent's inability to comply, and, in turn could remediate closure of the Tanks utilizing taxpayer dollars.

[25]Despite intimating in its Post-Hearing MOL that the Department did not intend for Fulton to be incarcerated at this stage, the Department's filings reflect that the agency has sought Fulton's incarceration since the first civil contempt proceeding.

41

$25,500 in unpaid fines.[26]   This $25,500 judgment is imposed for Corporate Respondent's failure to purge itself of civil contempt.  The Department has not provided the Court with a supplemental sanction to consider if Corporate Respondent fails to comply with the new purge schedule, imposed by the Order attached to this Opinion.  Accordingly, the Court will not impose *additional* sanctions at this time.[27]

## V.    **CONCLUSION**

Accordingly, Corporate Respondent remains in civil contempt of the Court's Stipulation Order and the Court will enter judgment on the previously-imposed civil contempt sanction, in the amount of $25,500.  For the reasons set forth above, the Court enters the following order, which will contain a new purge schedule, but does not impose an additional sanction.

_____
STACY WALLACE, Judge

---

[26]In another example of how the Department has acted more than reasonably with Corporate Respondent, at the hearing and again in its Post-Hearing MOL, the Department calculates the judgment at $25,500.  The Department could have asked the daily fine to accrue through the date of judgment.

[27]The Department is reminded that should the Department believe discovery is necessary as the case evolves, it may file a subsequent request with this Court.  The Department is further reminded that a *compensatory* civil contempt sanction must be "based upon evidence of [the] complainant's actual loss. . . ."  Cmwlth. Ct. Hr'g Notice ¶46 (quoting *Brocker v. Brocker*, 241 A.2d 336, 339 (Pa. 1968)).  The initial Contempt Order was entered before the *Turner* due process comports were implemented, however, Corporate Respondent chose to advance in this matter without counsel, and the Order went uncontested.  When a litigant elects to proceed without counsel, it does so at its own peril.  *Martinez v. City of Reading Police Dep't*, 289 A.3d 1136, 1139 n.13 (Pa. Cmwlth. 2023) ("'[I]t is axiomatic that a layperson who chooses to represent himself in a legal proceeding must assume the risk that his lack of expertise and legal training may prove to be his undoing'") (citation omitted).  Again, while the Court does not revisit its previous Contempt Order without an invitation from either party to do so, the Court warns the Department that future compensatory sanctions require a tether to **actual damages** under the law.

42

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | |
| Department of Environmental | : | |
| Protection, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Service Station Co. Inc. 1324 d/b/a | : | |
| Fulton's Service Station, | : | |
| Respondent | : | No. 214 M.D. 2023 |

## ORDER

NOW, December 9, 2025, following an August 19, 2025 hearing, and the Court's review of the Commonwealth of Pennsylvania, Department of Environmental Protection's (Department) November 15, 2024 "Certification of Noncompliance with [the Court's August 15, 2024 Contempt] Order" (Certification); January 16, 2025 "Petition for Contempt" (Purge/Sanctions Petition); and September 2, 2025 "Post-Hearing Memorandum of Law" (Post Hearing MOL"), the Court enters the following Order:

1. Service Station Co. Inc. 1324 d/b/a Fulton's Service Station's (Corporate Respondent) remains in civil contempt of this Court's August 15, 2024 Order (Contempt Order).

2. The Department's Purge/Sanctions Petition is hereby GRANTED IN PART to the extent it requests Corporate Respondent remain in contempt for failure to purge itself of the Court's August 15, 2024 Contempt Order and to the extent it requests imposition of a new civil contempt purge schedule; and for conversion of the unpaid fines into a judgment. The Department's Purge/Sanctions Petition is denied in part with respect to the Department's request for the incarceration of Corporate Respondent's President and

Treasurer, and the owner of the three storage tanks (Tanks) in question, Robert J. Fulton, Jr. (Fulton).

3. As a result of Corporate Respondent's failure to purge its of civil contempt as provided by the Contempt Order, the Court hereby CONVERTS the $25,500 in unpaid fines into a JUDGMENT against Corporate Respondent.

4. Corporate Respondent may purge itself of civil contempt by doing the following:

a. **By January 26, 2026**, Corporate Respondent must permanently close the Tanks and complete a site assessment at 1324 East Washington Lane in the City of Philadelphia, Philadelphia County, registered with the Department under the name Fulton Service Station, Facility Identification Number 51-45480, in compliance with 25 Pa. Code §§ 245.452, 245.453, and 245.455.

b. **By February 2, 2026**, Corporate Respondent shall amend the registration for the Tanks to reflect permanent closure, prepare a complete closure report, and submit both the amended registration and closure report to the Department in accordance with 25 Pa. Code § 245.452.

c. If contaminated soils, contaminated groundwater or free product as a liquid or vapor is discovered during permanent closure or site assessment activities, Corporate Respondent shall complete corrective action in accordance with 25 Pa. Code Chapter 245, Subchapter D, §§ 301 – 314 (relating to corrective action process for owners and operators of storage tank facilities and other responsible parties).

5. All submissions required by this Order shall be transmitted to the Department to the attention of: Carly Baker, Environmental Protection Specialist Department of Environmental Protection, 2 East Main Street, Norristown, PA 19401.

6. No later than **February 13, 2026**, the Department shall certify to the Court whether Corporate Respondent has purged itself of civil contempt pursuant to paragraph 4a-4c of the Court's Order.

7. Corporate Respondent, through counsel, will have until Wednesday, **February 18, 2026**, to file an answer to the Department's certification.

8. If Corporate Respondent fails to purge itself of civil contempt, the Department can file a request for discovery, a further sanctions hearing, or other remedy available to it under the law.

9. Fulton is hereby advised that Corporate Respondent's failure to purge itself of civil contempt, may serve as grounds for the Department to file a subsequent contempt sanctions petition, asking the Court to hold Fulton in civil contempt for Corporate Respondent's failure to purge itself and to **incarcerate Fulton** as a civil contempt sanction.

10. If Corporate Respondent fails to purge itself of civil contempt a second time, the Court will consider **incarcerating Fulton** as a civil contempt sanction.

11. The Department shall promptly serve this Order upon Respondent and thereafter promptly file a proof of service with this Court.

12. The Court retains jurisdiction of this matter.

_____
STACY WALLACE, Judge

3